**Bill KING et al., Appellants,**

v.

**Tommy BALLARD et al., Appellees.**

**No. 5643.**

Court of Appeals of Texas, Eastland.

Sept. 2, 1982.

Rehearing Denied Nov. 18, 1982.

George A. Day, Dana Smith, Day, Nabers & Smith, G. Lee Haney, Slagle & Haney, Brownwood, for appellants.

Thomas W. George, George & George, Patrick J. Feeney, Feeney, O'Hanlon & Moore, P.C., Austin, for appellees.

McCLOUD, Chief Justice.

Tommy Ballard entered into a written agreement to purchase 8220 shares of stock of The Bank of Woodson from Bill King, Cecil King, Zanna Anderson and Marvin Bellah. The contract provided that Ballard would purchase the controlling interest in the bank for $60.10 per share for a total of $494,022. Following the sale, Ballard sued the sellers of the stock urging several causes of action. The bank sued the sellers, as officers and directors, alleging that they violated their fiduciary duties. At the time of the sale, Bill King served as president of the bank and the other parties to the suit served on the board of directors. Cecil King, Zanna Anderson, and Marvin Bellah counterclaimed seeking payment of a $104,-019 promissory note executed by Ballard in partial payment for the bank stock. Following a lengthy nonjury trial and after offsetting the Ballard note, the trial court rendered judgment for Ballard and the bank against Bill King, Cecil King and Zanna Anderson. The court awarded Ballard actual and exemplary damages. The bank was awarded only actual damages. Judgment was entered in favor of Ballard against Cecil King for $43,425.62; against Zanna Anderson for $62,074.56; and against Bill King for $122,500. A joint and several judgment was entered in favor of the bank for $20,000 against Bill King, Cecil King, and Zanna Anderson. Marvin Bellah was dismissed prior to judgment. Bill King, Cecil King, and Zanna Anderson appeal.

We affirm in part, reverse and render in part, and reverse and remand in part.

## BALLARD'S CLAIM

On April 28, 1978, Ballard, who was interested in buying a small bank, met with the appellants at the bank to discuss its possible sale. At that time, Ballard was shown the daily balance sheet for April 27, 1978; a list compiled after a recent bank examination identifying the bank's problem loans; and a cease and desist order pertaining to Bill King's presidency. On May 8, 1978, a written contract, prepared by Ballard, was entered into by the parties. The contract provides in part:

1. The shares of the capital stock to be purchased are those outstanding shares of the capital stock now owned by you representing 82.2% of the total outstanding shares of capital stock; and

2. The purchase price to be paid for the shares is $60.10 a share for the 8,220 shares of the total outstanding 10,000 shares for a total purchase price of $494,022.00; and...

4. The book value is represented to be $28.30 per share as determined by the audit and evaluation of April 27, 1978. This book value will be verified by an examination conducted by the purchaser and/or his representative within twenty (20) days of the acceptance of this offer, closing to be on or before June 4, 1978.

The following language, which was included in the original draft, was deleted from the contract before it was signed by Cecil King on behalf of the sellers:

If upon examination it appears that loans on the books of the bank are classified as substandard or questionable or have been required to be written off, or in such other manner identified and evaluated as a liability rather than an asset, then you will escrow against such contingency and/or cause said loan to be moved from the portfolio of the bank and/or cause execution of guarantee which will be independently collateralized. In addition, in the event any loan currently on the books of said bank at the time of the purchase contemplated herein, is classified or required to be written off within the two examination periods next, then you will additionally agree to reimburse the undersigned, should he require it, in the amount of any ultimate loss from same after suit, judgment and execution; and

The thrust of Ballard's complaint is that the appellants misrepresented the true financial condition of the bank. Following the sale, Ballard undertook an extensive examination of the bank's outstanding loans. There is evidence that the examination revealed a substantial number of questionable loans and bad banking practices. The proper state and federal regulatory officials were notified, and they required the new owners of the bank to raise an additional $200,000 in new capital. Ballard supplied $198,000 of the required capital.

The court granted Ballard recovery on statutory and common-law fraud theories. The court found that the appellants misrepresented:

(1) the total value of the bank's capital accounts;

(2) the book value of the stock; and

(3) the quality of the bank's loan portfolio.

The court made appropriate findings that the misrepresentations were material; were made for the purpose of inducing Ballard to enter into the contract; and were reasonably relied upon by Ballard.

■ Appellants urge that there is no evidence, or alternatively, factually insufficient evidence to support the fraud findings. In deciding appellants' no evidence points, we must consider only that evidence favorable to the findings and disregard all evidence to the contrary. *Ray v. Farmers' State Bank of Hart*, 576 S.W.2d 607 (Tex. 1979). We consider all the evidence when determining if the evidence is factually insufficient to support a controlling fact finding. *In re King's Estate*, 244 S.W.2d 660 (Tex.1951). We cannot substitute our findings of fact for those of the trial court if the evidence is sufficient to support the

challenged findings made by the trier of fact. *Cavanaugh v. Davis,* 149 Tex. 573, 235 S.W.2d 972 (1951).

In *Stone v. Lawyers Title Insurance Corporation,* 554 S.W.2d 183 (Tex.1977), the court listed the following actionable fraud elements:

(1) that a material representation was made; (2) that it was false; (3) that when the speaker made it he knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by the party; (5) that the party acted in reliance upon it; (6) that he thereby suffered injury . . . .

Tex.Bus. & Com.Code Ann. Section 27.01 (Vernon 1968) provides:

(a) Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a

(1) false representation of a past or existing material fact, when the false representation is

(A) made to a person for the purpose of inducing that person to enter into a contract; and

(B) relied on by that person in entering into that contract . . . .

The court in *Rowntree v. Rice,* 426 S.W.2d 890 (Tex.Civ.App.—San Antonio 1968, writ ref'd n.r.e.) said, "Where there is a duty to speak, silence may be as misleading as a positive misrepresentation of existing facts . . . ."

Ballard testified that appellants assured him that the list of problem loans totaling $132,332, which they showed him on April 28, were the only problem loans in the bank and that the list "along with the daily statement sheet truly reflected the current value of the bank at that time." Following the examination by the new owner, $304,274 of the bank's loans were adversely classified and $232,583 were charged off. The substandard or charged off classification by a bank examiner does not mean that the notes are in fact uncollectable. An increase in classified loans requires an increased reserve account which affects the capital structure of the bank. There is testimony that because of these adversely classified loans, the Texas Banking Department required Ballard to add $200,000 new capital. The examination by Ballard revealed a large number of questionable loans. Several loans which were in default appeared to be "good new notes." There was evidence that Bill King, the bank president, operated partnerships with bank customers, and that he loaned the partners money to finance his partnership operations. There was evidence of "nominee" loans made in the name of one bank customer while the proceeds benefited another customer.

In *Wink Enterprises, Inc. v. Dow,* 491 S.W.2d 451 (Tex.Civ.App.—El Paso 1973, writ ref'd n.r.e.), a similar fact situation involving the purchase of bank stock, the court observed that the seller of the bank stock painted a "much rosier financial picture of the bank than was ultimately the case." There, as here, following the purchase of the bank, a substantial number of substandard notes were discovered by the bank examiners which required that additional capital be added to the bank's capital account. In *Wink,* many notes which were in default appeared to be current because of a practice, unknown to the purchaser of the stock, of making the payments out of a reserve fund. The court, in holding that a question of fact was presented, noted that, under certain circumstances, silence may be as misleading as a positive representation of an existing fact.

■ We point out that the fact that Ballard had a right under the contract to make an independent investigation of the bank's condition does not conclusively defeat his right to rely upon the alleged false representations. Whether Ballard relied upon the sellers' representations or upon his own independent investigation was a question of fact. The trial court resolved this issue in favor of Ballard. 25 Tex.Jur.2d Fraud and Deceit Section 27 (1961); 37 Am.Jur.2d Fraud and Deceit Section 231 (1968); 37 C.J.S. Fraud Section 37 (1943).

We hold that there is some evidence to support the expressed and implied fraud findings made by the trial court. After considering all the evidence, we hold that the evidence is factually sufficient to support such findings. We, therefore, overrule appellants' argument that the judgment in favor of Ballard should be reversed and rendered.

Appellants contend that the trial court erred in quashing subpoenas served upon Tommy Ballard, Custodian of Records of The Bank of Woodson, and John Freeman, directing the parties to produce correspondence concerning the purchase and sale of the bank between the served parties and the Texas Banking Department. Freeman replaced Bill King as president of the bank shortly after the bank was purchased by Ballard.

Ballard argues that the trial court acted properly pursuant to Tex.Rev.Civ.Stat.Ann. art. 342–210 (Vernon 1973) which provides in part:

> (A)ll information obtained by the Banking Department relative to the financial condition of state banks, whether obtained through examination or otherwise, except published statements, and all files and records of said Department relative thereto shall be confidential, and shall not be disclosed by the Commissioner or any officer or employee of said Department.

Tex.Rev.Civ.Stat.Ann. art. 342–211 (Vernon 1973) provides that if the "Commissioner or any officer or employee of the Banking Department shall ... divulge information or permit access to any file or record of the Banking Department in violation" of Article 342–210, "he shall be deemed guilty of a misdemeanor in office" and upon conviction shall forfeit his office or employment.

Ballard relies upon *Stewart v. McCain,* 575 S.W.2d 509 (Tex.1978), an original mandamus proceeding filed in the Texas Supreme Court, involving relators, who as officers and employees of the Texas Banking Department refused to furnish the "confidential section" of an "examination report" or testify as to any "information relative thereto." In discussing the information

sought and the reasons for confidentiality, the court said:

> In addition to the formal report of examination, the examiner prepares an interoffice memorandum to the Commissioner in connection with the examination report which is commonly referred to as the "confidential section." This memorandum is prepared on yellow paper and the information contained therein is based on an examiner's "hunches, opinions and impressions" obtained in the course of examining the bank. It is failure to produce this confidential memorandum for which respondents seek to hold relators in contempt. Commissioner Stewart points out that in the area of bank regulation this type of information is most important to the continuing process of monitoring, because the examiner's impression often becomes the first line of defense in averting problems at a bank. It is obvious that this type of information would seldom, if ever, be competent or admissible evidence. This fully supports the legislative insistence that this type information remain confidential.

The respondent in *Stewart* stated in his reply that he wanted to "learn the impressions and hunches" of the bank examiner. The Supreme Court pointed out that a "copy of the formal examination report is routinely supplied to the bank by the Commissioner as a part of the regulatory and supervisory process," and that a "copy of the formal report" was in the possession of respondent. The Court carefully limited its holding to the "confidential section of the report." The Court held that Article 342–210 prevented discovery of the interoffice memorandum.

Ballard alleged that he sustained damages because of the wrongful acts of appellants. He testified that as a result of their acts the Texas Banking Department required him to inject $198,000 of new capital into the bank. The appellants contended that Ballard knew when he bought the bank that he would have to add additional capital, and their position was that the conduct of Ballard brought on the bank's prob-

lems. Throughout the trial, Ballard and witnesses testifying on his behalf were permitted to testify that the new capital was required because of appellants' prior wrongful acts. Appellants, however, were not permitted to examine any of the written correspondence received by Ballard, the bank, or Freeman from the Texas Banking Department.

■ We think the trial court misconstrued the holding in *Stewart*. It is clear from *Stewart* and Article 342–210 that the statute only refers to officers and employees of the Texas Banking Department. The written information received by the parties in question, which related to the condition of the bank, was extremely important. Ballard's theory was that the Texas Banking Department, because of appellants' acts, required the additional capital. Nevertheless, the trial court refused to permit appellants to examine any written correspondence received by the parties from the Department. Appellants were not able to properly cross-examine Ballard's witnesses regarding information received by the Texas Banking Department because appellants were not permitted to examine any of the written correspondence. We hold that the trial court abused its discretion in quashing the subpoenas ordering the parties to produce the written correspondence. See *Sea Hoss Marine Enterprises, Inc. v. Angleton Bank of Commerce*, 536 S.W.2d 592 (Tex. Civ.App.—Houston [1st Dist.] 1976, writ ref'd n.r.e.).

■ We also agree with appellants that the court abused its discretion in entering an overly broad protection order as to David A. Flynn. Prior to closing the purchase of the bank, Ballard went to Austin, Texas, and discussed the proposed purchase with Flynn, the Deputy Banking Commissioner of the State of Texas. Appellants contended that at that time, Flynn told Ballard that he would have to put new capital into the bank. Ballard denied that he was so advised by Flynn. Appellants' witness, Drinkard, a banker, testified that prior to the sale, Ballard called him seeking information about Bill King. Drinkard tes-

tified that during this conversation, Ballard stated that Flynn told him that they had some problems in the bank, and in all probability he would need to inject some new capital into the bank. The trial court concluded that what Flynn told Ballard was "confidential" under Article 342–210 and appellants could not ask Flynn if he had advised Ballard that he would probably have to inject new capital into the bank. We do not think that Article 342–210 protects as confidential the remarks, if any, made by Flynn to Ballard regarding the need for additional capital. Article 342–210 protects from disclosure certain confidential and privileged information obtained by the Banking Department. It should not, however, protect previously disclosed or divulged information, when the issue is what information was disclosed or divulged. What Ballard knew and what he had been told regarding the bank were significant matters. It was manifestly unfair to appellants to permit Ballard to testify that he was not so advised by Flynn, and not allow appellants to ask Flynn if he told Ballard, prior to the purchase, that Ballard would probably have to inject new capital into the bank.

■ The court's erroneous construction of Article 342–210 permeated the entire trial. The appellants were prevented from utilizing crucial discovery procedures. We hold that the trial court abused its discretion and that the error constitutes reversible error under Tex.R.Civ.P. 434.

## BANK'S CLAIM

■ The court found that the appellants violated their fiduciary duties to the bank and awarded the bank actual damages of $20,000. There is evidence that Bill King, while serving as president of the bank, engaged in several wrongful activities. The trial court could properly conclude from the evidence that he personally received remuneration from bank customers as a condition for making loans. Also, that King conspired with his business partners, who were borrowers from the bank, to loan them money, and then convert the funds to

his own use. This device was used by Bill King to enable him to borrow indirectly sums in excess of the bank's loan limit.

In *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567 (Tex.1963) the court stated:

A corporate fiduciary is under obligation not to usurp corporate opportunities for personal gain, and equity will hold him accountable to the corporation for his profits if he does so.

There is evidence in the record that Bill King used the bank for his own personal profit in situations where he was under a duty to act in good faith and for the benefit of the bank. We hold there is some evidence to support the trial court's award of $20,000 for the breach of fiduciary duties by Bill King. After considering all the evidence, we further hold the evidence is factually sufficient.

■ We fail to find any evidence that Cecil King and Zanna Anderson breached their "fiduciary duties" to the bank. Cecil King and Zanna Anderson were not involved in the daily operation of the bank. They worked for another bank in another town. They served as directors, and as directors they were fiduciaries and owed the bank their good faith and loyalty. However, neither Cecil King nor Zanna Anderson did anything for their own personal advantage. They did not participate in any wrongful acts. The bank argues that they were aware of some of Bill King's wrongful acts and that they failed to stop the practices. Essentially, the bank argues that the directors, Cecil King and Zanna Anderson, breached their fiduciary duties in that they failed to properly manage the bank. It is generally stated that directors who fail to use care and diligence in the management and administration of the affairs and transactions of a bank are liable for losses which are the proximate result of their negligence. 10 Am.Jur.2d Banks Section 181 (1963); 9 C.J.S. Banks and Banking Section 119; 22 Baylor L.Rev. 157 (1970).

The bank in the instant case did not allege that Cecil King and Zanna Anderson were negligent in their conduct as directors.

The court's findings of fact and conclusions of law do not relate to a negligence theory. See 4 McDonald, Texas Civil Practice Section 16.09 (rev.1971). The court found that they breached their "fiduciary duties" as was alleged. We hold there is no evidence to support these findings.

The judgment in favor of Tommy Ballard against Cecil King, Zanna Anderson and Bill King is reversed, and Ballard's claim and the counterclaim filed by Cecil King and Zanna Anderson are remanded for a new trial. The judgment in favor of the bank against Bill King is affirmed. The bank's $20,000 judgment against Cecil King and Zanna Anderson is reversed, and we render judgment that the bank take nothing against them.

### ON APPELLEES' MOTION FOR REHEARING

■ Ballard argues that the protective order entered by the court did not prohibit the appellants from asking David A. Flynn if he told Ballard before he purchased the bank that he would have to put new capital into the bank. The order provides:

BE IT REMEMBERED that, on this, the 27th day of March, 1979, came on to be heard the motion of Daniel A. Flynn, Deputy Banking Commissioner of the Banking Department of the State of Texas, to quash or modify a subpoena. After a hearing on said motion to quash and on deponent's motion for a protective order, the court is of the opinion, and so finds, that said motions are well taken and that they should be sustained. It is therefore

ORDERED, ADJUDGED, and DECREED that, at any deposition of Daniel A. Flynn, Deputy Banking Commissioner, the deponent herein, said deponent shall not be asked any question calling for information relating to the financial condition of any state bank, and that, if said deponent is asked any such question relating to the financial condition of a state bank, he shall not be required to answer and he shall be protected by this order, (the following phrase was interlined) but

such questions as are not answered shall be certified to this court for its determination whether such question should be answered.

Ballard contends that the order instructs appellants to ask the question and then certify the question to the trial court for its determination if the question should be answered. The statement of facts unmistakably demonstrates that the court ruled at the pretrial hearing on the protective order issue that the conversation between Ballard and Flynn regarding the need for additional capital was privileged under Tex.Rev.Civ. Stat.Ann. art. 342–210 (Vernon 1973) and such question could not be asked. The typed portion of the protective order clearly states that Flynn, "shall not be asked any question calling for information relating to the financial condition of any state bank" and that if he is asked a question, "relating to the financial condition of a state bank, he shall not be required to answer." The penned interlined phrase regarding certification of a question was inserted, following a pretrial hearing, to apply when doubt existed as to whether a particular question called for information relating to the financial condition of a state bank. It is clear from the court's comments and rulings that the court, along with all the parties, concluded that Flynn's remarks to Ballard related to the "financial condition" of a state bank.[1] Appellants were not required to certify a question which the record shows the court clearly ruled was not to be asked.

Appellees point out that there is no order in the "transcript" denying appellants the right to inspect written correspondence concerning the purchase and sale of the bank, between the Texas Banking Department and Ballard, Freeman, or the bank. The statement of facts clearly reflects that the court refused, upon proper request, to require appellees to permit appellants to examine the written correspondence and reports in question. The court concluded, as urged by appellees, that all written correspondence and reports from the Texas Banking Department were privileged and confidential. We think the court erred in this regard.

Appellees' motion for rehearing is overruled.

---

1. The court consistently held that appellants could not ask Flynn what, if any thing, he told Ballard about the need for additional capital. Near the end of the trial, which lasted several days, appellants again pointed out to the court that under the court's rulings they could not go to the "source" (Flynn) to disprove Ballard's testimony regarding the alleged conversation. The court answered, "I believe that is true." Statement of Facts p. 2536.