764 A.2d 366

**Harry L. LEAVY**

v.

**AMERICAN FEDERAL SAVINGS BANK.**

**No. 0052, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Dec. 29, 2000.

182

Richard F. Boddie (Slocum & Boddie, P.C., on the brief), Springfield, for appellant.

Steven K. White (Morrison & Hecker L.L.P., on the brief), Washington, DC, for appellee.

Argued before HOLLANDER, THIEME,* and ADKINS, JJ.

ADKINS, Judge.

Harry L. Leavy ("Leavy"), appellant, appeals from the trial court's judgment that he breached his fiduciary duties to American Federal Savings Bank (the "Bank"), appellee. While Leavy was the president and chairman of the Bank's board of directors, he recruited some of the Bank's board members and others to make a $6.5 million loan to a troubled

---

* Thieme, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

borrower of the Bank, and secretly took a $650,000 loan brokerage fee for doing so. Later, Leavy fraudulently conveyed $450,000 to his son, Christopher Leavy ("Christopher"), placing those funds out of the Bank's reach.

After a four day bench trial and post-trial briefing, the trial court issued a written memorandum and opinion entering judgment against Leavy in the amount of $650,000, plus prejudgment interest, and judgment against Christopher in the amount of $450,000, plus prejudgment interest. After receiving some payments from Christopher, the Bank released its judgment against him. This appeal is solely on behalf of Leavy. Leavy raises the following issues, which we have rephrased:

I.  Whether there was substantial evidence to support the trial court's finding that Leavy breached his fiduciary duties to the Bank.

II. Whether the trial court properly entered separate restitutionary judgments against both Leavy and Christopher.

Finding no error and ample evidence that Leavy breached his fiduciary duties to the Bank, we affirm the judgment against him.

## FACTS AND LEGAL PROCEEDINGS

Since 1983, when he founded the Bank's predecessor-in-interest, Leavy served as the Bank's president and chairman of its board of directors. By 1989, the Bank had made 10 separate loans totaling $6.6 million to its largest borrower, Eugene N. Hooper. Federal regulators conducting an examination of the Bank harshly criticized the large concentration of troubled credit in a single borrower.

In response, Leavy negotiated with Hooper to restructure the debt. By the end of February 1989, Hooper had agreed to a refinancing plan that required him to reduce the debt by $1.1 million immediately, and by an additional $4 million within one year. The deal included additional security. Hooper agreed to give the Bank a first deed of trust on Hooper's

property known as the Cedar Crest Country Club, and a second deed of trust on a shopping center owned by Hooper. The plan also required real estate taxes and insurance on the collateral properties to be escrowed. We shall refer to the debt restructuring and refinancing plan as the "Cedar Crest Loan."

While he was negotiating with the Bank through Leavy, Hooper also was seeking additional credit. By March 1989, Hooper had a $3.3 million loan commitment from another lender. There was a 10% fee for that loan. But Hooper was not satisfied with the amount of that loan, and continued to look for other financing sources.

In pursuit of additional capital, Hooper approached Leavy about brokering a loan that would stand behind the Bank's loan. At the same time he was negotiating with Leavy about restructuring and reducing the Bank's loans, Hooper solicited Leavy to help him obtain other financing. He told Leavy that he would pay a 10% brokering fee for the loan, to be secured by a second deed of trust on the Cedar Crest Country Club property, behind the Bank's first trust.

Although he had never before brokered a loan and was still working on behalf of the Bank to lessen its exposure on the Hooper loans, Leavy agreed. He recruited 20 private lenders to loan Hooper $6.5 million, secured by a second deed of trust on the Cedar Crest property. We shall refer to this loan as the "Second Trust Loan." Ultimately, Leavy and four members of the Bank's board of directors participated in their individual capacities as part of the lending consortium for the Second Trust Loan.

Leavy did not disclose that he would earn a 10% brokerage fee to either the participating directors or to anyone else at the Bank. During the time Leavy was simultaneously negotiating the Cedar Crest Loan on behalf of the Bank and the Second Trust Loan on behalf of himself and Hooper, the terms of the Cedar Crest Loan changed, upon Leavy's recommendations. By June, the immediate $1.1 million pay down, the $4 million pay down after one year, and the escrow account, all of

which Hooper had agreed to in February, were no longer part of the deal. Instead of the total amount of the loan decreasing to $5.5 million (with another $4 million pay down in one year), the loan actually increased to $7.1 million (with no specific pay down provisions).

In addition, Leavy successfully recommended that the Bank release its security interest in a particular piece of Florida property that had served as collateral for one of the Bank loans that was being restructured as part of the Cedar Crest Loan (the "Jupiter Road Property"). On Leavy's recommendation, made during the time he was simultaneously working on the Cedar Crest Loan and the Second Trust Loan, the Jupiter Road Property was not included in the collateral for the Cedar Crest Loan. Leavy then used the Jupiter Road Property to secure Hooper's obligation to pay Leavy the $650,000 brokerage fee.

Still unaware of Leavy's brokerage fee for the Second Trust Loan, the Bank's board approved the Cedar Crest Loan on June 21, 1989, upon Leavy's recommendation. At the Bank's meeting on that loan, Leavy again did not disclose his fee arrangement for the Second Trust Loan, and did not obtain the Bank's permission to receive the fee for brokering the Second Trust Loan in his personal capacity rather than his corporate capacity.

Settlement on both the Cedar Crest Loan and the Second Trust Loan occurred the next day, on June 22, 1989. Because the two loans did not raise enough cash for Hooper to pay Leavy the $650,000 brokerage fee, Hooper executed a $750,000 promissory note to Leavy on the same day (the "Note"). The Note was due in one year, and was secured by the Jupiter Road Property.

Shortly after the Cedar Crest Loan closed, Hooper received more than $1 million as a distribution from his partnership interest in a property known as "Stringfellow Road." Leavy knew that the Bank had a security interest in the Stringfellow Road proceeds, because the property was collateral for the Cedar Crest Loan. Nevertheless, he allowed Hooper to keep

$200,000 of the funds. Hooper gave $800,000 to Leavy, who put it into an account at the Bank, over which he was the sole trustee.

Leavy allowed some of the $800,000 proceeds to be used for purposes other than the payment of principal that Hooper owed to the Bank. He authorized and directed that some of the Stringfellow Road proceeds be used to make Hooper's interest payments on the Cedar Crest Loan. In addition, he released $75,000 of the funds directly to Hooper on May 24, 1990. On June 22, 1990, Leavy released another $75,000 to Hooper and First Federal Savings and Loan of the Palm Beaches ("First Federal"). First Federal then loaned Hooper $650,000. Those funds were immediately used to pay Leavy his $650,000 brokerage fee. The $650,000 check from the title company that handled the First Federal loan for Hooper was issued to Leavy on June 25, 1990, the next business day after Leavy released the $75,000 to First Federal. According to Leavy, he invested the $650,000 in Hooper's Cedar Crest Country Club.

Eventually Hooper defaulted on both the Cedar Crest Loan and the Second Trust Loan. Leavy did not pursue foreclosure of the Bank's first deed of trust on the Cedar Crest property. Instead, he allowed the Second Trust Loan group to foreclose on the Cedar Crest Country Club Property. They eventually settled with the Bank. Leavy lost all his investments in both the Second Trust Loan and the Cedar Crest Country Club.

On April 6, 1994, at an emergency meeting of the Bank's board of directors, Leavy's criminal defense lawyer disclosed that Leavy had received the $650,000 fee in connection with the Second Trust Loan. At the board's request, Leavy resigned from the Bank. After Leavy resigned, the Bank asserted a claim against Leavy for the $650,000. One of Leavy's assets that was considered in discussions regarding that claim was an interest in a limited partnership that owned property on Reisterstown Road. In early 1996, Leavy's interest in that property was sold. On March 1, 1996, Leavy conveyed to his son Christopher $450,000 of the proceeds from that sale.

On April 3, 1997, the Bank filed suit against Harry Leavy and Christopher Leavy in Montgomery County Circuit Court. Before trial, the Bank elected to proceed against Harry Leavy solely on its equitable claims. The Bank sought a judgment establishing a constructive trust and/or ordering Leavy to pay restitution for the $650,000 brokerage fee, plus interest from June 25, 1990. In addition, the Bank proceeded on its fraudulent conveyance claims against Christopher, seeking a judgment in the amount of $450,000 plus prejudgment interest from March 1, 1996.

After trial, the court issued a written memorandum opinion and order. The court found, *inter alia,* that Leavy had breached his fiduciary duties to the Bank by obtaining the $650,000 fee for his personal benefit, that Leavy's transfer of the $450,000 to Christopher was a fraudulent conveyance, and that the Bank was entitled to judgment against Leavy in the amount of $650,000, plus $373,856.85 in prejudgment interest, and to judgment against Christopher in the amount of $450,000, plus $105,423.22 in prejudgment interest. Leavy then filed this appeal.

## DISCUSSION

### I.

### Motion To Dismiss

Preliminarily, we address the Bank's two motions to dismiss this appeal. When Leavy sought extra time to file his brief in this Court, the Bank opposed that motion and moved to dismiss the appeal.[1] By order dated August 17, 2000, we

---

1. Leavy's brief was due on July 24, 2000. On that date, he filed a motion to extend the time to file his brief, citing "a number of errors in the preparation and printing of the Record Extract, for which [counsel] is partly to blame...." Alleging professional commitments and absence from the office, he asked for an extension until August 21. The Bank opposed the motion, and sought dismissal of the appeal. It argued that there was no good cause shown for the extension, and alleged *inter alia* several violations of the appellate rules, including that appellant's counsel had failed to serve the notice of appeal, the informa-

allowed Leavy extra time to file his brief—until August 21, 2000. We also denied the Bank's motion, but without prejudice to its right to seek that relief in its brief.

Leavy filed his brief in this Court a week late, on August 28, 2000, without requesting further extension of time, and apparently without consulting the Bank's counsel regarding either the late filing or the record extract. The Bank filed a second motion to dismiss the appeal, and renews both motions in its brief. In addition to the unauthorized late filing of the brief, the Bank contends that Leavy "knowingly neglected to make any effort to comply with Rule 8–501(d) [requiring cooperation in the preparation of the record extracts], even after his prior failure to comply with that Rule had been brought to his attention" in the Bank's first motion to dismiss. The Bank also complains that Leavy's record extract is materially incomplete, and necessitated the filing of an appendix to the Bank's brief. It also asserts that Leavy compounded his pattern of failing to serve the Bank with documents by failing to serve a copy of his opposition to the Bank's second motion to dismiss, despite the claim in the certificate of service that he mailed it on September 13, 2000. The Bank asks that this appeal be denied or dismissed, or in the alternative, that appellant's counsel be ordered to pay the costs incurred by the Bank in printing an appendix to its brief and in filing the two motions to dismiss.

Leavy opposed the second motion to dismiss, arguing that he filed his brief by mail on August 25th because he did not receive the Court's order granting the extension until August 21, the date the brief and record extract were due under the extended deadline. Relying solely on "lack of prejudice" as a defense, appellant's counsel offered no reason for failing to consult with the Bank's counsel regarding the late filing or the record extract.

---

tion report, and a designation of the parts of the record that he intended to include in the record extract as required by Md. Rule 8–501. In response, appellant's counsel "conceded" that he did not comply with Rule 8–501, "but note[d] that it was merely an oversight."

We agree with the Bank that these actions evidence a pattern of unacceptable disregard for the appellate rules of this Court. In particular, we find the late filing of appellant's brief and record extract, seven days after the extended deadline established by special permission of this Court, inexcusable. This late filing clearly warrants dismissal of the appeal.

Dismissal of an appeal, however, is a discretionary matter. *See* Md. Rule 8–502(d), 8–602. In light of our decision in this case, and the evidence that these failures may have resulted from counsel's actions, we will not exercise that discretion against appellant. Given the avoidable expenses incurred by the Bank as a result of the admitted failures of appellant's counsel to comply with the appellate rules, however, we will grant the Bank's request for costs. Counsel for appellant will reimburse the Bank for the costs of preparing and printing the appendix to its brief, and for the costs of preparing the Bank's second motion to dismiss. The Bank should submit an appropriate order for such costs, with affidavits and such other evidence as is necessary to establish the reasonableness of such expenses, within 10 days after the filing of this opinion.

## II.

### Merits Of The Appeal

#### A.

#### Standard Of Review

In an action tried without a jury, we "will review the case on both the law and the evidence." Md. Rule 8–131(c). In doing so, we "give due regard to the opportunity of the trial court to judge the credibility of the witnesses." *Id.* Our review is limited to deciding whether there was sufficient evidence to support the trial court's conclusions. *See Gwynn v. Oursler,* 122 Md.App. 493, 502, 712 A.2d 1072, *cert. denied,* 351 Md. 662, 719 A.2d 1262 (1998). "[T]he trial judge may believe or disbelieve, credit or disregard, any evidence introduced, and a reviewing court may not decide on appeal how

much weight must be given as a minimum to each item of evidence." *Loyola Federal Sav. Bank v. Hill,* 114 Md.App. 289, 307, 689 A.2d 1268 (1997).

## B.

### Breach Of Fiduciary Duty Of Loyalty

The trial court agreed with the Bank that Leavy had breached his fiduciary duty of loyalty in three respects: (1) using his corporate office and the Bank's assets for his private gain, rather than for the Bank's best interest; (2) placing his interests in conflict with the Bank's interests; and (3) usurping the Bank's corporate opportunity. On appeal, Leavy argues that the evidence did not support these findings. As set forth below, we find that there was substantial evidence to support the trial court's finding that Leavy breached his fiduciary duty of loyalty to the Bank by misusing his office and the Bank's property, and by failing to act in the Bank's best interests. Because that finding was sufficient by itself to support the judgment against Leavy, we do not reach the issues raised by Leavy regarding the trial court's alternative grounds for the judgment.

### 1.

### Misuse Of Corporate Office And Corporate Assets

Corporate officers and directors are fiduciaries who are under a duty to act for the benefit of the corporation. *See Restatement of the Law, Restitution,* § 190 cmt. a (1937). For this reason, Maryland courts have long recognized that a corporate officer may not use the corporate office or assets for personal gain. *See Levin v. Levin,* 43 Md.App. 380, 390, 405 A.2d 770 (1979). The purpose of the rule is to prevent fiduciaries from straying from their obligations. *See, e.g., Restatement, supra,* § 197 cmt. c (rule "rests upon a broad principle of preventing a conflict of opposing interests in the minds of fiduciaries . . . ").

"Where a fiduciary in violation of his duty to the beneficiary receives . . . a bonus or commission or other profit, he holds what he receives upon a constructive trust for the beneficiary." *Id.* at § 197. "If the [fiduciary] has made a profit through the violation of a duty to the plaintiff to whom he is in a fiduciary relation, he can be compelled to surrender the profit to the plaintiff, although the profit was not made at the expense of the plaintiff." *Id.* at § 160, cmt. d (1932). Courts have awarded restitutionary judgments against bank presidents who receive commissions or other personal profits by violating their duty of loyalty to the bank. *See, e.g., King v. Ballard,* 643 S.W.2d 457, 463 (Tex.App.1982), *rev'd in part on other grounds,* 652 S.W.2d 767 (Tex.1983) (judgment against bank president who received fees for procuring loan); *Fleishhacker v. Blum,* 109 F.2d 543, 546 (9th Cir.), *cert. denied,* 311 U.S. 665, 61 S.Ct. 23, 85 L.Ed. 427 (1940) (same); *Broadway Fed. Sav. & Loan Ass'n v. Howard,* 133 Cal.App.2d 382, 285 P.2d 61, 69 (1955) (judgment against bank president in amount of secret commissions); *Blackburn's Adm'x v. Union Bank & Trust Co.,* 269 Ky. 699, 108 S.W.2d 806, 809 (1937) (judgment against bank president in amount of fees charged for mortgage loan transactions); *see generally* 47 A.L.R.3d 373 (2000) (liability of corporate officer or director for commission or compensation received from third person in connection with that person's transaction with corporation). "In these situations the [fiduciary] is compelled to surrender the benefit on the ground that he would be unjustly enriched if he were permitted to retain it, even though that enrichment is not at the expense or wholly at the expense of the plaintiff." *Restatement, supra,* at § 160 cmt. d; *see generally* 47 A.L.R.3d 373, *supra* (collecting cases).

We applied these standards in *Levin, supra,* where we recognized that a corporate officer's use of corporate property without the knowledge or approval of the board of directors constitutes a breach of his duty of loyalty. Levin, the president of several family-held corporations, secretly borrowed money from the corporations in order to purchase real property in his own name. We held that this unauthorized use of

corporate property, made possible by Levin's misuse of his corporate office, violated the fiduciary duty of loyalty. *See Levin,* 43 Md.App. at 390–91, 405 A.2d 770. In doing so, we summarized the fiduciary standard governing the actions of a corporate officer: "In dealing with corporate assets [the corporate officer] was required to act in the best interests of the corporation and he was prohibited from using either his position or the corporation's funds for his private gain." *Id.* at 390, 405 A.2d 770. We held that this disloyal corporate officer was not entitled to retain any benefit obtained as a result of his breach of duty to the corporations. *See id.*

In this case, the trial court concluded that Leavy misused his corporate office and the Bank's assets for his private gain, and that he failed to act in the best interests of the Bank. We find ample evidence in the record for this factual finding. The trial court cited multiple ways in which Leavy misused his office and the Bank's assets. We summarize the trial court's findings, and the supporting evidence.

First, there was substantial evidence that Leavy misused his corporate office and the Bank's assets to obtain the opportunity to participate in and broker the Second Trust Loan, to solicit investors for that loan, and to obtain the secret $650,000 brokerage fee. The trial court found that in failing to disclose the brokerage fee, Leavy acted for his personal gain, and not in the best interests of the Bank.

Hooper was the Bank's largest borrower. Federal banking regulators had already criticized the Bank for its unduly risky exposure on its 10 loans to Hooper, and had directed the Bank to reduce that exposure by restructuring Hooper's debt. While he was acting solely on behalf of the Bank in negotiating the restructuring of the Hooper loans, Leavy negotiated a restructuring plan under which the $6.6 million debt would be paid down to approximately $1.5 million, within one year. That plan included increased security for the Bank, via an escrow account and additional collateral. Hooper agreed to the plan and executed the Bank's February 27, 1989 loan commitment letter based upon those terms.

Leavy testified that a short time later, Hooper offered Leavy the opportunity to make some money on the side, as both a broker and an investor. Leavy had never brokered a loan before. After Leavy agreed to participate in and broker the Second Trust Loan for Hooper, he continued to act as the Bank's representative in the debt restructuring negotiations with Hooper. During this time period, Leavy allowed the Bank's position with respect to the Hooper loans to deteriorate.

According to the Bank's expert witness, Steven Butler, a certified bank fraud examiner, Leavy breached his duty to the Bank by failing to disclose the fee arrangement. Keeping his fee secret from the Bank prevented the other directors from appreciating that Leavy's decisions could be influenced by the fee and by his duties to the Second Trust Loan investors.

[Leavy] was president of the bank, in effect acting as senior loan officer ... or a loan officer, where he could put together a loan for the [B]ank up to the [B]ank's lending limit, and at the same time would be able to influence other people potentially to invest in [the Second Trust Loan].

I say influence because this is not your typical loan broker going out trying to find financing. This is a bank president and moreover a bank president who has shown confidence in this borrower by making a loan to the extent of the [B]ank's legal lending limit, as big a loan as this [B]ank could make.

Here was someone going to a potential investor saying ... I'm a bank president, I think this is a good investment, our [B]ank is investing in this deal, I would like to ask you to invest in this deal.

That all sounds very positive and very convincing absent the fact that he is earning a fee for doing it and that is the problem.

\*     \*     \*

The issue ... [is] disclosure, just let the board know.... [W]hen the board is making a loan decision for the bank, it knows of that opportunity for the banker who is presenting

the loan [to earn a brokerage fee] and they can take that into consideration when they make their decision.

Butler testified that Hooper acquired enormous leverage and influence over Leavy once Leavy agreed to broker the Second Trust Loan in his personal capacity. In his opinion, the Bank's position vis-a-vis the Hooper loans substantially deteriorated from February to June 1989. A series of commitment letters from Leavy, on behalf of the Bank, to Hooper, shows that Leavy ultimately caused the Bank to agree to a restructuring package that did not reduce the Bank's exposure on the Hooper loans, but did facilitate his investment and fee on the Second Trust Loan. Unlike the February loan restructuring deal that Leavy struck with Hooper, the deal that Leavy ultimately recommended to the Bank's board in June 1989 did not contain the same immediate and short term pay down provisions. Moreover, it authorized a loan of $7.1 million instead of $5.5 million, and did not require escrow of taxes and insurance on collateral properties. Instead, it provided for additional security interests in other properties in which Hooper had an interest, including the Stringfellow Road property.

The Cedar Crest Loan ultimately facilitated the Second Trust Loan, which closed the same day as the Cedar Crest Loan, and the payment of Leavy's brokerage fee. Butler testified that the Second Trust Loan "put the [B]ank's loan at further risk because there was even more money going out to this club...." "[I]n putting together a second trust on the very same project, Cedar Crest, [Leavy] ... doubl[ed] the amount of exposure that the project has, ... and committ[ed] that project and the borrower to twice the amount of debt service." Moreover, by increasing the amount of money loaned to Hooper, with interest only payments, rather than reducing the principal balance via a current $1.4 million pay down, and future scheduled paydowns, and waiving the tax and insurance escrow requirement, the Bank undertook a substantially riskier loan to this high risk real estate developer. Taking additional collateral was not an equal "tradeoff" because the collateral property—the country club—could not

sustain the debt service, and the entire project concept had never been subjected to appropriate scrutiny via standard loan underwriting or feasibility studies.

We think this evidence amply supported the trial court's factual finding that "Leavy breached his duty of loyalty by using his corporate office and [the Bank's] assets for personal gain." In addition to Leavy's disloyalty in failing to disclose his brokering the Second Trust Loan, we also find substantial evidence to support the trial court's findings that Leavy breached his duty of loyalty by misusing his office and the Bank's assets in several other ways.

- Leavy misused his corporate office and misused the Bank's collateral to obtain payment of the $650,000 brokerage fee in his personal capacity. Based on the Bank's June 1989 commitment letter and Leavy's correspondence with Hooper after the Cedar Crest Loan closed, the trial court found that the Bank had a security interest in the Stringfellow Loan proceeds. Leavy admitted that he released $75,000 of the Stringfellow Road proceeds to Hooper and First Federal on the day before First Federal funded its loan to Hooper. Butler opined that the documents showed that the $75,000 was used to obtain the First Federal loan, which in turn, was used to pay Leavy the $650,000 fee.

- Leavy failed to act in the Bank's best interests, by failing to assert the Bank's collateral rights in $200,000 of the Stringfellow Road proceeds, by permitting Hooper to keep that money for himself, and by using the Stringfellow Road proceeds to make Hooper's interest payments on the Cedar Crest Loan instead of requiring Hooper to make the interest payments from other sources and preserving those funds for repayment of principal. On appeal, Leavy has not directly challenged any of these findings, electing instead to contest whether the Bank actually had a security interest in that property. We shall address that issue in part 2 of this opinion.

- Leavy used his corporate office to authorize the release of the Jupiter Road property as collateral, to exclude the Jupiter Road property as collateral for the Cedar Crest Loan, and to secretly use the Jupiter Road Property to secure Hooper's promissory note for his brokerage fee. We think there was substantial evidence to support the trial court's conclusion that "[w]hen the Jupiter Road Property was refinanced in 1990, Harry Leavy received his fee of $650,000, and [the Bank] received nothing." In fact, Leavy has not challenged this finding.

Any one of these serious misuses of corporate office and assets was sufficient grounds for the trial court's holding that Leavy breached his fiduciary duty of loyalty to the Bank. Collectively, they establish that Leavy made a calculated decision to take advantage of his position as the Bank's president, chairman of the board, and negotiator on the Hooper loan account to obtain a personal benefit that the Bank did not know about, share in, or benefit from. In doing so, he compromised his loyalty to the Bank, and clearly failed to act solely in its best interests.

On appeal, Leavy has not addressed the trial court's finding that he breached his duty of loyalty by misusing his corporate office and the Bank's assets. Instead, he focuses on the other "conflict of interest" and "usurpation of corporate opportunity" grounds for the judgment. The Bank urges us to affirm the judgment based solely on this aspect of the trial court's finding, because "even if Leavy were to prevail in [the other] challenges ..., [the] judgment against him would still be supported and valid based on" his misuse of corporate office and property.

Although we generally agree with the proposition advanced by the Bank, we recognize that in other parts of his brief, Leavy has challenged certain factual findings underlying the trial court's conclusion that Leavy misused his corporate office and assets. Specifically, Leavy argues that (1) the Bank's exposure on its loans to Hooper was actually diminished by the $7.1 million Cedar Crest Loan; (2) the expert testimony of

Steven Butler should be disregarded; and (3) the Bank did not have an interest in the Stringfellow Road proceeds. To ensure that judgment on the misuse grounds was appropriate, we shall address each of these contentions as it relates to the misuse of corporate office and assets rationale of the trial court. For the reasons discussed below, we find that none of Leavy's contentions has merit.

## 2.

## Leavy's Defenses

Leavy argues that the Cedar Crest Loan actually reduced the Bank's exposure on the Hooper loans, because it was secured by collateral with a higher value. He tallies up the purported value of the collateral properties as grounds for this contention. We do not think the evidence cited by Leavy mandates this conclusion. More importantly, however, Leavy's focus on the difference between the Hooper loans before the restructuring negotiations began in early 1989 and the final Cedar Crest Loan in June 1989 is misplaced. As the Bank correctly points out, the relevant comparison for purposes of evaluating Leavy's conduct is between the restructuring terms that Leavy negotiated in February 1989, before he began brokering the Second Trust Loan, and the restructuring terms that Leavy negotiated, accepted, recommended, and persuaded the Bank's board of directors to accept in June 1989, after he brokered the Second Trust Loan. The trial court properly relied on the expert testimony of Steven Butler and the series of commitment letters from the Bank to Hooper in making its finding that the Bank's position deteriorated during this period. By itself, that evidence supported the trial court's finding that Leavy misused his corporate office and the Bank's assets to advance his personal interests, and in doing so, compromised the Bank's best interests. It alone merited the judgment against Leavy.

On appeal, Leavy challenges Butler's testimony on the grounds that it is not credible, for a list of reasons outlined in its brief. The simple answer is that we may not reassess

the credibility of this expert witness, or the weight of his testimony. That is quintessentially a job for the trial court sitting as a fact-finder in this bench trial. *See* Md. Rule 8–131(c). In deciding whether there is sufficient evidence to support the trial court's factual finding, we assume the truth of all the evidence relied upon by the trial court, and of all favorable inferences fairly deducible from that evidence. *See Carling Brewing Co. v. Belzner,* 15 Md.App. 406, 412, 291 A.2d 175 (1972). "[I]f there is any competent, material evidence to support the factual findings below, the weight and value of such evidence must be left to the trier of facts, as it is not our function to determine the comparative weight of conflicting evidence." *Id.* In this case, Butler's testimony supported his opinion that the deterioration in the Bank's position from February to June reflected that Leavy's loyalties and judgment had been compromised by his simultaneous brokering of the Second Trust Loan. Thus, it supported the trial court's findings of deterioration, misuse of office, failure to act in the Bank's best interest, and ultimately, of disloyalty.

Finally, Leavy challenges the trial court's finding that he breached his duty of loyalty by mishandling the Stringfellow Road proceeds, by arguing that the Bank did not have a security interest in the Stringfellow Road property or proceeds.[2] In support of that argument, he contends that the Bank's documents do not clearly establish the Bank's security interest in this property. In response, the Bank points out that its June 1989 commitment letter includes the Stringfellow Road property as collateral for the Cedar Crest Loan. It also draws our attention to the following excerpt from a February 23, 1990 letter from Leavy to Hooper, in which Leavy asserts the Bank's security interest as the proceeds of a condemnation award for the property were being distributed by the Stringfellow Road partnership.

---

**2.** Notably, this is Leavy's only defense to the trial court's finding that he misused those proceeds in ways that helped himself and harmed the Bank.

[The] Bank, by virtue of an Assignment of Partnership Interest has [a]dditional [s]ecurity dated June 22, 1989, has a security interest in the funds being distributed in the referenced partnership. The assignment dated June 22, 1989 replaces the assignment dated April 25, 1988. It is our understanding that the Partnership intends to make an immediate distribution of funds. Accordingly, [the] Bank agrees to the following distribution: . . . .

2. American Federal Savings Bank—$800,000

3. Eugene N. Hooper—Balance

Please cause these funds to be wired not later than 2 p.m. this date . . . .

Moreover, a February 22, 1990 letter from Richard F. Boddie, Leavy's attorney, indicates that Leavy's February 23rd letter merely copied a draft letter that Boddie forwarded in order to "timely and properly conclude the distribution of funds from the condemnation award . . . ." There was uncontroverted evidence that the proceeds were distributed in accordance with the instructions in Leavy's letter to Hooper.

We agree with the Bank and the trial court that these documents are sufficient to establish that the Bank had a security interest in the Stringfellow Road proceeds, and that Leavy knew that the Bank was looking to the Stringfellow Road proceeds as collateral for the Cedar Crest Loan. Accordingly, we find no error in the trial court's finding that Leavy breached his fiduciary duty to the Bank by acting for his personal interests and by failing to protect the Bank's best interests with respect to the Stringfellow Road proceeds.

In doing so, we also wish to comment on the exclusion of the two February, 1990 letters from Leavy's record extract. They bear directly upon a question that Leavy raised in his brief—whether Leavy knew that the Bank had a security interest in the Stringfellow Road proceeds. The letters were written by Leavy and Boddie. Their words in these letters contradict their argument in this appeal. Clearly, these documents were relevant and material to this appeal. They should have been included in Leavy's extract. *See* Md. Rule 8–501(c) ("The

record extract shall contain all parts of the record that are reasonably necessary for the determination of questions presented by the appeal"). Apparently, they were excluded because Leavy and Boddie chose not to include them, and not to comply with the requirements of our appellate rules governing the preparation of the record extract. *See* Md. Rule 8–501(d). We find that this attempt to challenge the trial court's factual finding without addressing these critical documents reflects poorly on counsel's skills or his candor with this Court. We expect better conduct from members of this bar.

### 3.

### Alternative Findings Of Breach

The trial court also concluded that Leavy breached his fiduciary duty of loyalty by placing himself in a conflict of interest with the Bank, and by misappropriating the Bank's opportunity to broker the Second Trust Loan. In light of our holding that Leavy has failed to establish that the trial court erred in finding that he misused his corporate office and the Bank's assets, we will not address these alternative grounds.

### C.

### Judgment Against Christopher Leavy

Leavy argues that it was error for the trial court to enter "two separate judgments for the same monies," because if the Bank collects on both the judgment against Christopher and the judgment against Leavy, the Bank will obtain a double recovery windfall. He contends that he is entitled to a "dollar-for-dollar" credit for any monies paid by his son Christopher, and asks us to modify the judgment accordingly.

The Bank counters that the two separate judgments are typical when a plaintiff has or seeks a judgment against both the fraudulent transferor and the transferee. It asserts that it "has not interpreted the judgments to combine into a $1.5 million total," but that it is "entitled to a total recovery of $1,023,856.85, plus post-judgment interest." Finally, it points out that Christopher Leavy did not appeal the judgment

against him, which the Bank has released as the result of the negotiation of certain voluntary payments and transfers of stock to the Bank.

We think the entry of two separate judgments was proper, even though the Bank may only collect a total of $1,023,856.85, plus interest. Because the Bank has collected some unspecified amount from Christopher Leavy, and has released its judgment against Christopher Leavy, however, it is appropriate that Leavy now be credited with those amounts collected. We will not vacate the judgment against Leavy. We remand the case to the trial court, however, for such proceedings as are necessary to determine how much credit to apply against the Harry Leavy judgment for the money and stock the Bank has received from Christopher Leavy.

**JUDGMENT AFFIRMED, BUT CASE REMANDED FOR FURTHER PROCEEDINGS REGARDING EXECUTION OF THE JUDGMENT. COSTS TO BE PAID BY APPELLANT.**