62 A.3d 212

## SHIH PING LI

v.

## TZU LEE.

Shih Ping Li

v.

Tzu Lee.

No. 0727, Sept. Term, 2010.
No. 2622, Sept. Term, 2011.

Court of Special Appeals of Maryland.

March 4, 2013.

74

Barton D. Moorestein, (Blank & Moorestein, LLP, on the brief), Rockville, MD., for Appellant.

Geraldine W. Hess, (Hess Family Law, on the brief), Rockville, MD., for Appellee.

Panel: ZARNOCH, WRIGHT and LAWRENCE F. RODOWSKY, (Retired, Specially Assigned), JJ.

WRIGHT, J.

This case arises out of the Circuit Court of Montgomery County's denial of appellant, Shih Ping Li's ("Husband"), motions to set aside the settlement agreements he entered with appellee, Tzu "Cindy" Lee ("Wife"), in 2005 and 2008. On April 19, 2010, the circuit court held a hearing on Husband's Motion to Set Aside the First and Second Agreements ("Motion to Set Aside"). The circuit court ruled that the agreements were valid because they were not unconscionable and no confidential relationship existed between Husband and Wife or between the parties and the attorney who represented

Wife in preparing the agreements. The agreements were subsequently incorporated, but not merged, into the parties' Judgment for Absolute Divorce. Husband filed a timely appeal from the circuit court's denial of his Motion to Set Aside. While that appeal was pending, Husband filed a Motion to Revise on October 14, 2011, seeking to have the agreements invalidated. The first appeal was stayed and the circuit court was instructed to consider Husband's Motion to Revise. On December 27, 2011, the circuit court denied Husband's Motion to Revise and on January 24, 2012, Husband noted an appeal from that denial. On October 9, 2012, the appeals were consolidated.

## Questions Presented

Husband presents several questions for our review,[1] which we have consolidated and rephrased as follows:

---

1. Husband presented the following three questions in his first appeal, *Li v. Lee*, No. 727, September Term 2010:

Whether The Trial Court Was Legally Correct When It Determined As A Matter of Law That Attorney Gu Had No Attorney–Client relationship With Husband And That No Confidential Relationship Existed Between Husband, Wife And Yu Gu.

Whether The Trial Court Was Legally Correct When It Failed To Modify The Burden Of Proof From Husband, To Prove That The Agreements Were Unenforceable, To The Wife, To Prove That The Agreements Were Facially Fair.

Whether The Trial Court Was Legally Correct When It Determined That The Agreements Were Not Unconscionable As A Matter Of Law When It Had No Financial Information From Wife Sufficient To Undertake An "Unconscionability" Analysis, Or Any Alimony Analysis Regarding, Either Wife's Ability To Be Self Sufficient Or Whether The Parties Standard of Living Would Be Unconscionably Disparate. Husband presented the following two questions in his second appeal, *Li v. Lee*, No. 2622, Sept. Term 2011:

Whether the Lower Court Abused Its Discretion In Denying Appellant's Motion to Revise, When It Failed To Exercise Discretion By Not Considering Appellant's Pleadings And Arguments, Including Appellant's Reply To The Response In Opposition To Motion To Revise.

Whether The Lower Court Abused Its Discretion And/Or Was Legally Correct When It Failed To Hold A Hearing On Appellant's Motion to Revise and Appellant's Reply To The Response In Opposition To Motion To Revise Given The Clear Evidence of Extrinsic Fraud.

1. Did the trial court err in determining that no confidential relationships existed and the Agreements were valid?
2. Did the trial court err or abuse its discretion in denying Husband's Motion to Revise?

For the reasons that follow, we find no error or abuse of discretion and affirm the circuit court's judgments.

### Facts and Procedural History

Husband and Wife met in Taiwan in 1977 and had a brief romantic relationship. Both subsequently married other partners and had children. The parties rekindled their romance in approximately 1989 or 1990, when both were still married to their respective spouses and Wife was living in Toronto, Canada.

Husband divorced his first wife in 2002, with a Voluntary Separation and Property Settlement Agreement dated October 17, 2001, incorporated into the Judgment of Absolute Divorce. Pursuant to that agreement, Husband paid $800 per month in child support, twenty percent of exceptional expenses, maintained coverage for his two minor children on his health insurance, and was responsible for a proportion of the college expenses for his two children.[2] When Wife divorced her first husband in 1994, according to an agreement executed on December 29, 1993, she received no monetary support for herself or her daughter.

When Husband and Wife were contemplating marriage, Husband was employed by the United States Government earning $108,985 per year.[3] Wife was employed with a private

---

2. In the settlement agreement from his first divorce, Husband also agreed to designate his first wife as the recipient of $1 per month of his federal retirement benefit and survivor annuity so that she could continue her health coverage under the Federal Employees Health Benefits Plan after the divorce. Husband also waived any rights to his first wife's ownership interest in her law firm. Husband transferred title of the marital home to his first wife and the wife assumed all obligations for the mortgage of that property.

3. Husband states in his brief that "in the year prior to his marriage to Wife, Husband had earned $108,985 per year working for the United

company as an accountant earning approximately $65,000. Before marrying, Husband and Wife sought to change Wife's immigration status and obtain Lawful Permanent Resident ("LPR") status for her. To do so, they sought the assistance of Yu Gu, an immigration attorney, recommended by one of Wife's work friends.

In 2002, Gu prepared an application for adjustment of permanent resident status for Wife, which included the I–130 form, "Petition for Alien Relative," and an I–864 form, the "Affidavit of Support." Husband was designated as the petitioner and Wife was the beneficiary. In order to prepare the forms, Husband, without physically meeting or communicating with Gu, provided his 2002 tax return information as well as bank statements documenting a joint account for Husband and Wife. Gu prepared and submitted the application forms to the United States Citizenship and Immigration Services ("US-CIS") on June 30, 2003. Wife's application was ultimately approved on April 12, 2005, and she was granted conditional permanent resident status based on her marriage to Husband, a naturalized citizen.[4]

---

States Department of Transportation" ("USDOT") and at the "time of his marriage, he had obtained new employment with the Department of Homeland Security [("DHS")], and had obtained an increase of income to $133,512 per year." Husband's resume lists his employers as the Department of Justice from 1997 to 2003, the Transportation Security Administration, DHS from 2003 to 2006, and the Comptroller of the Currency from 2006 onward. The USDOT is not listed.

4. To obtain LPR status via marriage, the citizen spouse must sponsor the immigrant spouse and file an I–130 form along with an Affidavit of Support. The Affidavit of Support states that the immigrant will not become a public charge because the sponsor will financially support the immigrant. As part of the immigration process, the immigrant and the family member who filed the I–130 on their behalf generally must appear for an interview at a USCIS office and bring originals of all documentation submitted as part of the application, unless USCIS officers determine such an interview is unnecessary.

If the marriage is less than two years old, the spouse will be granted permanent resident status on a conditional basis for two years. Ninety days before the conditional resident status expires, in order to obtain LPR status, the parties must file with USCIS to have the conditions removed, in part by providing documentation demonstrating that the

Husband and Wife were married to each other on June 12, 2003. After marrying, the parties decided to sell their pre-marital homes and purchase a marital home together. The parties purchased a home at 508 Oak Knoll Terrace, Rockville, Maryland ("Oak Knoll house"), with Husband contributing $100,000 from the sale of his former home and Wife contributing $82,000 from the sale of hers. The parties incurred a joint mortgage payment of $6,000 on the Oak Knoll house with Husband contributing $4,000 per month and Wife contributing $2,000 per month toward the payment. The parties made payments out of a joint checking account. On the mortgage application, Husband listed his employer as the United States Department of Homeland Security ("DHS"), with a monthly income of $11,675, or a yearly income of approximately $140,100. Husband's W–2 tax form from 2004 listed his employer as the United States Department of Transportation and his earnings as $125,689.36.

In 2005, the parties decided to downsize their residence and contracted to build a new home in Frederick, Maryland, located at 4003 Bowling Green Lane (the "Frederick house"). Later the same year, Wife discovered that Husband had engaged in an affair resulting in the parties discussing divorce. The parties decided to prepare a separation agreement ("the First Agreement") in part to guarantee that Wife, having sold her former home, would continue to have a residence. Initially, the parties considered trying to repurchase Wife's Gaithersburg townhouse but the price had increased too much. The parties agreed to title the Frederick house in Wife's name only and that Husband would continue to contribute the same amount ($4,000) toward the mortgage expense.

Wife contacted Gu to prepare an agreement and told Husband that Gu would be her representative. Husband was not contacted by Gu during the preparation of the agreement and Husband never met Gu. Gu prepared the First Agreement

marriage is bona fide. Proof of a bona fide marriage can include joint accounts and joint property ownership. 8 U.S.C.S. § 1186a (2011); *See generally,* www.uscis.gov.

.

according to the terms indicated by Wife. Wife presented the First Agreement drafted by Gu to Husband in the fall of 2005. Husband reviewed the draft First Agreement and edited it by adding a provision to reduce his obligation in the event he lost his job or otherwise suffered a salary reduction and also by capping his obligation at $4,000 regardless of whether his salary increased. The First Agreement provided for the $4,000 payment to be made as indefinite, non-modifiable alimony, with the payment to be applied toward the mortgage. The First Agreement contained a provision stating that Gu had represented only Wife in drafting the agreement and advised Husband to seek independent counsel.

The parties reconciled after executing the First Agreement. They sold the Oak Knoll house and applied the proceeds of the sale toward the Frederick house. Both parties moved into the Frederick house. In July 2006, Husband began living with his mother in Rockville, Maryland, during the weekdays and he returned to the Frederick house on weekends.

In 2007, the parties petitioned to have the conditions removed from Wife's immigration status. Gu was again used to prepare the necessary paperwork and she filed an I–751 form, or "Petition to Remove Condition." To facilitate preparation of the petition, Wife provided Gu with the parties' joint tax returns [5] and other joint records, including auto insurance, health insurance, home insurance, bank account statements, and mortgage statements. Husband had no contact with Gu during the preparation of this petition.

In mid- to late–2007, Wife discovered Husband had engaged in another affair causing the parties to again discuss divorce. Husband was now employed by the Comptroller of the Currency earning $171,332, not including benefits. Husband's two children were now adults, and his support obligations for them were nearing conclusion. As before, Wife contacted Gu to draft a new separation agreement ("Second Agreement"). Gu did so, according to terms provided by Wife, e-mailed the draft to

---

5. The parties prepared joint tax returns from 2003 through 2008.

Wife, and Wife then e-mailed the draft to Husband in the Fall of 2007.

The parties discussed the terms of the new agreement, ultimately negotiating terms different from the original draft. Negotiated changes included limiting the alimony as non-taxable to Wife and non-deductible to Husband to a three-year term instead of indefinitely. The parties exchanged marked-up versions of the Second Agreement with Wife providing these to Gu to make the changes. Gu did so, and Wife forwarded the amended Second Agreement to Husband. On January 31, 2008, Husband e-mailed Wife stating that he thought the Second Agreement, not yet executed, was unfair to him and he wanted to rethink it.

On February 4, 2008, Husband returned a marked-up version of the Second Agreement to Wife. In an e-mail to Wife, Husband stated:

I have made the changes that we've agreed:

1. Made the non-taxable alimony period to be 3 years after separation;

2. Provide life insurance of $300K to you for 3 years after separation; and

3. Agreed to pay any tax liability for you for the non-taxable alimony payments;

I hope to make this easy for you and Gu to review. Let me know what changes you would want.

I will get the court paperwork to find out what I have to file.

On February 5, 2008, Husband e-mailed Wife a clean copy of the Second Agreement with one additional change. Wife agreed to the changes made by Husband and Gu prepared the final document. Gu e-mailed the final document to Wife, who forwarded it to Husband. On February 18, 2008, the parties met in a parking lot near Wife's work and went together to Falls Grove Chase Bank, where they signed and notarized the Second Agreement.

In December of 2008, Husband and Wife exchanged a series of e-mails. On December 17, Wife e-mailed Husband stating in part, "I got your message and right away responded you [sic]. I believed I have clearly explained why I don't want to deal with any changes any more." Husband responded on December 18, 2008, stating:

I understand your decision. We are both trying to move on with our lives. There are no winners here. I have helped you to get through the U.S. citizenship process so you can be working in Government jobs now (as opposed to 2 years later).

I think we could follow the current understanding as summarized below:

(a) Ping to continue to provide 3 years of tax-free alimony (@$4000 per month) to Cindy for 2008, 2009, and 2010;

(b) From 2011 and on, Ping will provide the $4000 monthly alimony as taxable income to Cindy;

(c) Ping and Cindy to file as "Married and Filing Jointly" for Tax Years 2008, 2009, and 1010[sic];

(d) Ping to file for divorce in October of 2009 (after 12 months of formal separation), the divorce proceedings will likely be concluded in early 2010;

(e) Ping and Cindy to each file their own tax returns for tax year 2011 and after;

(f) Cindy retains sole ownership of the 4003 Bowling Green Lane property; and

(g) Ping will stay on the current primary mortgage for the 4003 Bowling Green Lane property for 2008, 2009, and 2010. Starting in 2011, Cindy will consider options to remove Ping from the primary mortgage without impacting Cindy's ability to maintain ownership of the property.

These are summaries done in good faith and not meant to change your rights or ownership.

Wife responded on December 18, 2008, stating, "Ping, it is actually contained in our agreement and I have no problem to

follow through." In a later e-mail the same day, Wife elaborated:

> Ping, let me make more clear that we have legal agreement binding us and I will follow through it. Anything beyond our agreement that is totally out of my control. Whatever I entitled from our marriage I am appreciated. I got my county job that is nothing to do with my citizenship since county employee is not required U.S. citizenship. I am thankful your help to update my resume.
>
> Please don't fight for any non existing battle and I always consider any possible release between us.
>
> Please take easy and take care, we all have tough time to overcome.

Husband responded, "Sorry. You're right. I will follow what was signed. More words just get more misunderstanding."

On August 14, 2009, represented by his current counsel, Husband filed a Complaint for Judgment of Absolute Divorce and for Other Appropriate Relief ("Complaint for Divorce"), in which he prayed for a divorce and to have "all Agreements between the parties be voided and set aside as unenforceable." In Wife's Answer to Husband's Complaint for Divorce, she prayed "[t]hat the terms and provisions of the Marital Settlement Agreement between the parties dated February 8, 2008 be validated. . . . and made a part of and incorporated in the Judgment of Absolute Divorce, but not merged therein[.]"

On September 17, 2009, Husband filed his Motion to Set Aside arguing that the marital settlement agreements were "unconscionable, unenforceable, were entered into by [Husband] without full benefit of counsel and at a time when the parties were still within a confidential relationship and while [Husband] was susceptible to being taken advantage of, and is (or should be) of no force and effect." In Husband's Motion to Set Aside, he stated: "That at the time [Husband] executed the Marital Settlement Agreements, [Husband] was unrepresented. [Wife] had an attorney prepare the Agreements." Wife responded that the Agreements were not unconscionable,

no confidential relationship existed, and Husband had been advised to seek independent counsel.

On April 19, 2010, a hearing was held on Husband's Motion to Set Aside. The circuit court heard testimony from both parties and Gu. Gu testified that she did not believe that she represented Husband in the immigration matters or in the preparation of the Agreements. Gu had been subpoenaed to bring her records pertaining to the immigration petitions but she testified that she did not possess the originals, had recreated the forms on her computer to simulate what was filed, and could not verify that they accurately represented what she filed with USCIS. The circuit court found that no attorney-client relationship or confidential relationship existed between Husband and Gu.

In its oral opinion, the circuit court stated:

I find, as a first level fact, that both the plaintiff, on the one hand, and the defendant, on the other hand, are sophisticated persons. Both of them have advanced degrees, not only college degrees, but master degrees.

Although the plaintiff is not on the business side of his agency, he is an exceptionally highly-educated, well-spoken, and sophisticated individual. While I do agree with him that only a government contracting officer can obligate the United States Treasury to pay money, he is unduly modest in his description of his level of authority, and in his business acumen.

The Court finds that lawyer Yu Gu never, as a first level fact, represented the plaintiff; that objectively, from an objective point of view, lawyer Gu was never the lawyer for the plaintiff; and that the Court does not credit the plaintiff's testimony that subjectively, he honestly believed that Ms. Gu was his lawyer.

\* \* \*

The, this case is most unlike the *Hale* [*v. Hale*, 74 Md.App. 555, 539 A.2d 247 (1988)] case. Attorney Gu served a limited function in the INS matters. She was not, quote/unquote, "the family lawyer." She was not, quote/unquote,

"the family business lawyer," as was Mr. Belsky in the Hale case, with which I am most familiar.

\* \* \*

The Court finds that both agreements were fully, and carefully, and thoroughly negotiated between the plaintiff, on the one hand, and the defendant, on the other hand. This is not even close to a, not only a take-it-or-leave-it situation, but it is clear, and I find that the negotiations between the parties for both the October 18, 2005, agreement, and the February 8th, 2008, agreement, were intense, thorough, thoughtful, and was a good-faith, give-and-take between the parties.

The Court finds that the reason the plaintiff did not seek or obtain the assistance of counsel was very simple. He didn't want to spend the money to do so. Nobody, I find, dissuaded him, in any way, shape, or form, from seeking counsel. Nobody, I find, suggested to him, in any way, shape, or form, that he didn't need counsel. I find that the [sic] fully knew he could utilize counsel. But as I said, I find he simply didn't want to pay for it. That's his right. Nobody can be compelled to hire a lawyer. But one fails to avail themselves of the resources of counsel, frankly, at their peril.

Unlike Judge Whitfill in *Williams* [*v. Williams,* 306 Md. 332, 508 A.2d 985 (1986) ], and Judge Smith in *Hale,* I am not shocked by the terms and provisions of either the October 18, 2005, or the February 8, 2008, contracts.

While it very well may be that, at the conclusion of a fully-litigated Phase 2 merits, Family Law case, the plaintiff would not be paying indefinite alimony at all, would not be paying alimony to the tune of $4,000, would not be paying non-modifiable alimony, the Court finds that he bargained for these very terms. He elected to preserve his capital, to preserve his pension funds, his bank accounts.

\* \* \*

So the notion that the plaintiff got nothing from the deal is simply legally not correct. Not only did he buy the time

and the stream of payments, he purchased appropriately—until he decided he didn't like the deal—he purchased the absence of litigation; he purchased the absence of discovery; he purchased the absence of a trial; he purchased the absence of the attorneys fees; he purchased the absence, to be blunt, of the aggravation and pain that comes from this sort of litigation, or any litigation.

Now, he has decided later, after reflecting, that he doesn't like his deal. So now, we have the litigation. But that was his choice.

I find that this is simply, and respectfully, a case of buyer's remorse. He doesn't, upon reflection, he doesn't like the deal he cut for himself, even though, I must say, it was cut over a substantial period of time.

* * *

So, it is not, I find, procedurally unconscionable. It is not, I find, substantively unconscionable. Consequently, the claim that a court in equity should set aside either or both of the contracts because of unconscionability is denied.

* * *

As an initial matter, the Court finds that the plaintiff has failed to carry his initial burden of proof, production, and persuasion to show the existence, factually, of a confidential relationship. If anything, it was the plaintiff who had the power in the relationship, and was the dominant party, and not the defendant.

* * *

There is legally insufficient evidence, in my judgment, of duress, coercion, undue influence, fraud. Period.

* * *

I find that he had an opportunity to seek counsel but he elected [not] to do so, solely for pecuniary reasons. He didn't want to spend the money.

I find that the defendant, in no way, shape, or form, dissuaded him from seeking counsel.

▮▮▮▮▮▮▮▮▮

I find that, at any point between February of 2005, through and including the signing of the final agreement on February 18th, 2008, in front of the notary public at the bank, nobody stopped him from having it looked at by a lawyer. He simply elected not to do so. It's not the defendant's fault, responsibility, or obligation.

So although the plaintiff may not have obtained independent legal advice before signing either of the contracts, he was neither dissuaded nor precluded from doing so. I note, as well, he did not sign either of these agreements immediately upon presentment, but both were the product of extended and substantial negotiations.

\* \* \*

Since I find that there are no excusing factors, such as fraud, undue influence, coercion, attorney influence not present here, one having the capacity to understand a written document, and who reads it, and I find that the plaintiff, in this case, read it and understood it; or as the Court of Appeals said, "Without reading it or having it read to them, to him, who signs it is bound by his signature."[6]

\* \* \*

Even if, assuming without deciding that the plaintiff had any—I'm sorry—that the defendant had any burden, I am persuaded that she's carried her burden of proof, production, and persuasion to persuade me, as a first level of fact, that both agreements, under the circumstances, were fair and reasonable to all parties, both represented a compromise and neither side got everything they wanted. And I

---

**6.** The court is referencing *Higgins v. Barnes*, 310 Md. 532, 537, 530 A.2d 724 (1987), where the Court of Appeals stated:

Ordinarily, parol evidence is inadmissible to vary, alter, or contradict a contract that is complete and unambiguous. An exception to the rule is that parol evidence may be admitted to reform a written instrument upon a showing of fraud, duress, or mutual mistake. Without the presence of one of these excusing factors one having the capacity to understand a written document who reads it, or, without reading it or having it read to him, signs it, is bound by his signature. (Internal citations and quotation marks omitted).

suspect, in a full-bore litigation between the plaintiff, on the one hand, and the defendant, on the other, it would be hammer and tongs. But it's not going to be because these agreements are to be enforced.

On April 22, 2010, Husband's Motion to Set Aside was denied. On May 7, 2010, Husband filed a Supplemental Complaint for Judgment of Absolute Divorce and For Other Appropriate Relief. On May 20, 2010, the parties were granted an absolute divorce and the Agreements were incorporated, but not merged, into the judgment. Husband noted an appeal of the judgment on June 11, 2010.[7]

While Husband's appeal was pending, he filed a Freedom of Information Act ("FOIA") request with the USCIS National Records Center on April 4, 2011, seeking copies of the I–130 and I–864 petitions filed by Gu. The documentation provided by USCIS included G–28 forms entitled "Notice of Entry of Appearance," which listed Gu as the representative for both parties, and were signed by Gu and both parties in 2003 and 2007. A cover letter on Gu's law firm's letterhead was also included and stated that in 2007, Gu was submitting the I–130 and I–485 forms "for Appellee Tzu Lee on behalf of Mr. Shiping Li." The copies of the original documents from USCIS were handwritten on the standardized forms.

On October 14, 2011, after receiving the documentation from USCIS, Husband filed a Motion to Revise on the ground of fraud and requested a hearing on his motion. Wife filed a response opposing the motion, and Husband filed a reply to Wife's response. On October 18, 2011, Husband filed a Motion to Stay Appeal and Oral Argument which was granted on November 21, 2011. On December 22, 2011, the circuit court denied Husband's Motion to Revise. Husband noted an appeal of the denial on January 24, 2012.[8] On June 15, 2012, a Motion to Lift Stay and Consolidate Appeal was filed; the motion was granted on October 9, 2012.

---

7. *Li v. Lee,* No. 727, September Term 2010.

8. *Li v. Lee,* No. 2622, September Term 2011.

On November 30, 2012, Husband filed a Motion to Supplement the Record. On December 12, 2012, Wife filed her opposition. On December 17, 2012, Wife filed a Motion to Dismiss Husband's Motion to Supplement the Record. These motions will be addressed below. Additional facts will be included in the discussion as necessary.

## Motions

### I. Wife's Motion to Dismiss Appeal No. 727, September Term, 2010

 This Court generally will not dismiss an appeal unless the appellee is prejudiced by appellant's noncompliance with the Maryland Rules. *See Rogers v. Baker*, 77 Md.App. 199, 204–05, 549 A.2d 1153 (1988). Moreover, dismissal of an appeal is a discretionary matter. This Court has declined to exercise that discretion even when noncompliance with the Maryland Rules warrants dismissal. *See Leavy v. Am. Fed. Sav. Bank*, 136 Md.App. 181, 191, 764 A.2d 366 (2000) (declining to exercise discretion based on decision to affirm trial court and assessing costs against appellant for preparation costs incurred by appellee).

Wife filed a Motion to Dismiss Husband's first appeal with her brief submitted to this Court on July 25, 2011. In her motion, Wife argued that Husband's brief did not comply with Md. Rules 8–503(d) and 8–504. Maryland Rule 8–503(d) states:

> d) Length. Except as otherwise provided in section (e) of this Rule or with permission of the Court, a brief of the appellant and appellee shall not exceed 35 pages in the Court of Special Appeals or 50 pages in the Court of Appeals. This limitation does not apply to (1) the table of contents and citations required by Rule 8–504(a)(1); (2) the citation and text required by Rule 8–504(a)(7); and a motion to dismiss and argument supporting or opposing the motion. Except with permission of the Court, any portion of a brief pertaining to a motion to dismiss shall not exceed an additional ten pages in the Court of Special Appeals or 25

pages in the Court of Appeals. Any reply brief filed by the appellant shall not exceed 15 pages in the Court of Special Appeals or 25 pages in the Court of Appeals.

Wife argues that Husband's brief exceeds the maximum number of pages by two pages. Our review of the docket reveals that Husband filed a Nunc Pro Tunc Motion for Leave to File Brief Exceeding Page Limit with this Court on August 1, 2011, and his motion was granted on September 21, 2011. Therefore, there is no violation of Maryland Rule 8–503(d).

Maryland Rule 8–504, entitled "Contents of brief" states in pertinent part:

(a) Contents. A brief shall comply with the requirements of Rule 8–112 and include the following items in the order listed:

(1) A table of contents and a table of citations of cases, constitutional provisions, statutes, ordinances, rules, and regulations, with cases alphabetically arranged. When a reported Maryland case is cited, the citation shall include a reference to the official Report.

(2) A brief statement of the case, indicating the nature of the case, the course of the proceedings, and the disposition in the lower court, except that the appellee's brief shall not contain a statement of the case unless the appellee disagrees with the statement in the appellant's brief.

(3) A statement of the questions presented, separately numbered, indicating the legal propositions involved and the questions of fact at issue expressed in the terms and circumstances of the case without unnecessary detail.

(4) A clear concise statement of the facts material to a determination of the questions presented, except that the appellee's brief shall contain a statement of only those additional facts necessary to correct or amplify the statement in the appellant's brief. Reference shall be made to the pages of the record extract supporting the assertions. If pursuant to these rules or by leave of court a record extract is not filed, reference shall be made to the pages of

the record or to the transcript of testimony as contained in the record.

██ Wife argues that Husband's Statement of Facts contains insufficient references to the record extract along with statements unsupported by evidence produced at trial, and that Husband's brief failed to contain a statement of the font and type size used in the brief. On August 1, 2011, Husband filed a Statement as to Font and Type size which this Court accepted. Regarding the insufficiency of Husband's citations, we find that Wife suffered no prejudice by Husband's failure. As Husband bears the burden of proof in the appeal, his failure to call our attention to the relevant parts of the record is to his detriment. *See, e.g., Davis v. Davis,* 97 Md.App. 1, 24, 627 A.2d 17 (1993) (citing Md. Rule 8–501(1)). Accordingly, Wife's Motion to Dismiss Appeal No. 727 is denied.

## II. Husband's Motion to Supplement the Record and Wife's Motion to Dismiss [Husband's] Motion to Supplement the Record

Husband filed his motion "pursuant to Md. Rule 8–414(a)" in an effort to have this Court consider a public reprimand issued to Gu by the Maryland Attorney Grievance Commission after Husband's Motion to Revise was denied. Maryland Rule 8–414(a) states: "Authority of appellate court. On motion or on its own initiative, the appellate court may order that an error or omission in the record be corrected."

Husband argues in his reply to Wife's Motion to Dismiss that the reprimand of Gu did not exist at the time of the hearing and, therefore, could not have been presented to the circuit court to use in its determination that Gu had an attorney-client relationship with Husband and Wife in the immigration matters. Husband is correct. However, the reprimand emanates from other information, also omitted from the trial record, that was in existence at the time of the hearing—the original immigration forms submitted by Gu to USCIS and obtained by Husband from a FOIA request. The original forms could have been obtained by Husband prior to

the hearing. The immigration forms are relied upon by Husband in his argument appealing the circuit court's denial of his Motion to Revise.

 Wife is correct that under a plain language reading, Maryland Rule 8–414 does not provide for evidence created after a record is closed by the trial court to be considered. *Beyond Sys. v. Realtime Gaming Holding Co., LLC,* 388 Md. 1, 11 n. 9, 878 A.2d 567 (2005) (denying motion to supplement the record "[b]ecause the evidence at issue was not erroneously omitted from the record transmitted from the Circuit Court, and [appellant] does not seek to correct any error contained in the record"); *Campbell v. State,* 37 Md.App. 89, 97 n. 5, 376 A.2d 866 (1977) (denying motion to supplement the record with docket entries from a separate case involving a key witness but taking judicial notice of the official records); *but see In re Adoption of Sean M.,* 204 Md.App. 724, 732 n. 5, 42 A.3d 722 (2012) (granting a motion to supplement the record when the transcript of the contested hearing was originally omitted from the record for the appeal); *Bethesda Title & Escrow, LLC v. Gochnour,* 197 Md.App. 450, 14 A.3d 670 (2011) (granting motion to supplement the record regarding filings in circuit court on same matter). Husband cites no case law to the contrary, and we are unable to discern any.

 "Only in exceptional cases, when the requirements of logic are overcome by the demands of justice, is it proper to exercise the discretionary power of an appellate court in this State to look to a proceeding outside the record of the case before it." *Dashiell v. Meeks,* 396 Md. 149, 176–77, 913 A.2d 10 (2006) (holding that this Court did not abuse its discretion in declining to review the record from a divorce action that gave rise to a malpractice action). Husband does not ask us to take judicial notice of the public reprimand, nor does he state that his case is exceptional, warranting a review of evidence outside the record. As we discuss below, the existence of an attorney-client relationship between Husband and Gu in the immigration matter is not dispositive of the appeal, and therefore, we decline to exercise our discretion and take

judicial notice of the evidence not in the record. Further, we deny Husband's motion on the basis that Maryland Rule 8–414(a) does not permit supplementation of an appellate record with evidence not presented to the trial court.

## Discussion

The two appeals, No. 727 and No. 2622, although briefed separately were consolidated on motion and argued together. Therefore, the issues are discussed below in the order that they were disposed of by the circuit court.

## I. Standard of Review

 We review the circuit court's factual findings under a clearly erroneous standard and its legal conclusions *de novo.*

> If any competent material evidence exists in support of the trial court's factual findings, those findings cannot be held to be clearly erroneous. When reviewing mixed questions of law and fact, we will affirm the trial court's judgment when we cannot say that its evidentiary findings were clearly erroneous, and we find no error in that court's application of the law. On the other hand, regarding pure questions of law, the trial court enjoys no deferential appellate review, and the appellate court must apply the law as it discerns it to be.

*Fischbach v. Fischbach,* 187 Md.App. 61, 88–89, 975 A.2d 333 (2009) (internal citations and quotation marks omitted).

 We review the trial court's denial of Husband's Motion to Revise for an abuse of discretion. An abuse of discretion occurs where "no reasonable person would take the view adopted by the [trial] court" or the trial court "acts without any guiding rules or principles." *Das v. Das,* 133 Md.App. 1, 15–16, 754 A.2d 441 (2000) (citing *North v. North,* 102 Md.App. 1, 13–14, 648 A.2d 1025 (1994)). An abuse of discretion constitutes "an untenable judicial act that defies reason and works an injustice." *Id.* "We do not disturb a trial court's discretionary ruling simply because we would not have made the same ruling." *Abrishamian v. Barbely,* 188 Md.

App. 334, 342, 981 A.2d 797 (2009) (citing *King v. State,* 407 Md. 682, 697, 967 A.2d 790 (2009)); *Smith v. Luber,* 165 Md.App. 458, 467, 885 A.2d 894 (2005) (trial judge is afforded a "wide latitude"); *Das,* 133 Md.App. at 16, 754 A.2d 441 (citing *Wormwood v. Batching Syss., Inc.,* 124 Md.App. 695, 700, 723 A.2d 568 (1999)). Further,

> [B]ecause the exercise of discretion under these circumstances depends so heavily upon the unique opportunity the trial judge has to closely observe the entire trial, complete with nuances, inflections, and impressions never to be gained from a cold record, it is a discretion that will rarely, if ever, be disturbed on appeal.

*Titan Custom Cabinet, Inc. v. Advance Contracting, Inc.,* 178 Md.App. 209, 231, 941 A.2d 547 (2008) (quoting *Buck v. Cam's Broadloom Rugs,* 328 Md. 51, 59, 612 A.2d 1294 (1992)).

As this Court stated in *Steinhoff v. Sommerfelt,* 144 Md.App. 463, 484–85, 798 A.2d 1195 (2002):

> With respect to the denial of a Motion to Alter or Amend, if that should be what is before us, the discretion of the trial judge is more than broad; it is virtually without limit. What is, in effect, a post-trial motion to reconsider is not a time machine in which to travel back to a recently concluded trial in order to try the case better with hindsight. The trial judge has boundless discretion not to indulge this all-too-natural desire to raise issues after the fact that could have been raised earlier but were not or to make objections after the fact that could have been earlier but were not. Losers do not enjoy carte blanche, through post-trial motions, to replay the game as a matter of right.
>
> * * *
>
> That a party, arguendo, should have prevailed on the merits at trial by no means implies that he should similarly prevail on a post-trial motion to reconsider the merits. A decision on the merits, for instance, might be clearly right or wrong. A decision not to revisit the merits is broadly discretionary. The appellant's burden in the latter case is overlaid with an additional layer of persuasion. Above and beyond arguing

the intrinsic merits of an issue, he must also make a strong case for why a judge, having once decided the merits, should in his broad discretion deign to revisit them.

## II. The Enforceability of the Separation Agreements

Husband's argument, while circuitous, is essentially three-fold. First, Husband argues that the circuit court did not have necessary facts, or used erroneous facts, to determine that the separation agreements were equitable and that no substantive or procedural unconscionability existed. Second, Husband avers that the circuit court erroneously concluded that no attorney-client relationship existed between Husband and Gu so as to give rise to a confidential relationship between them and shift the burden of proof from Husband to prove that the Agreements are unconscionable and to Wife to prove that the Agreements are facially valid. Third, intertwined with his other arguments, Husband contends that the agreements were procedurally and substantively unconscionable.

Wife counters that the circuit court had sufficient evidence to support its factual findings and correctly applied the law. Wife argues that no confidential relationship existed between the parties or between Husband and Gu and, therefore, the circuit court correctly allocated the burden of proof to Husband to show unconscionability. Wife asserts that the circuit court correctly found that no procedural or substantive unconscionability existed.

This Court has had multiple occasions to address the validity of separation agreements. In *Blum v. Blum*, 59 Md.App. 584, 602, 477 A.2d 289 (1984), the Court set forth guidelines for analyzing unconscionability:

What the chancellor should have done was to look at the consideration and determine if the terms were so unfair and inequitable as to require that the agreement be set aside. If they were not, and he held they were not, he should then have considered whether there was a confidential relationship; then he should have considered whether there was duress. If he found there was duress, he should next have

considered (1) whether the conditions precedent to setting aside the agreement had been met, including whether the victim had retained the benefits; (2) whether the contract was thereafter ratified; and (3) whether laches applied. Then and only then should he have decided whether to set aside the agreement[.]

*Accord Williams,* 306 Md. at 342, 508 A.2d 985; *Young v. Anne Arundel Cnty.,* 146 Md.App. 526, 598, 807 A.2d 651 (2002).

### A. "Fairness of the Agreements: Substantive Unconscionability "

The Court of Appeals stated in *Walther v. Sovereign Bank* that in determining if substantive unconscionability exists, "we must consider whether the terms in the [contract] are so one-sided as to oppress or unfairly surprise an innocent party or whether there exists an egregious imbalance in the obligations and rights imposed by the [contract]." 386 Md. 412, 431, 872 A.2d 735 (2005) (alterations added). The Court stated that an "exactly even exchange of identical rights and obligations between the two contracting parties before a contract" are not necessary before the contract "will be deemed valid." *Id.* at 433, 872 A.2d 735.

Two prominent cases on unconscionability are *Hale,* 74 Md.App. 555, 539 A.2d 247, and *Williams,* 306 Md. 332, 508 A.2d 985. In both cases, the unrepresented spouse signed a separation agreement believing that doing so would facilitate a reconciliation. In *Hale,* however, a confidential relationship existed between the parties, whereas, here one does not.[9]

---

9. In *Hale,* the husband argued that it was unreasonable for the wife to "repose trust in him 'in the inherently adverse context of separation negotiations.' " 74 Md.App. at 565–66, 539 A.2d 247. The Court noted that in *Hale,* the "evidence does not paint a picture ... of the typical adversarial marital break-up[,]" citing the on-going sexual relations of the parties and the husband's expressions of remorse over his affairs and promises to provide for the wife and their minor child. *Id.* at 566, 539 A.2d 247. The husband had also told the wife that he would only discuss reconciliation after she signed the separation agreement. *Id.* at 569, 539 A.2d 247. None of these facts are present in the instant case.

Notably, in *Williams*, the Court made clear that because it "was unable to conclude that [the trial court's] factual findings were clearly erroneous, we are bound by those findings, as was the intermediate appellate court." 306 Md. at 338, 508 A.2d 985. In *Williams*, the trial court found that agreement shocked the court's conscience because it provided for the husband to relinquish all interest in marital property and custody of his children, assume all marital debt and obligations, and most importantly, the husband's weekly obligations under the settlement agreement exceeded his weekly income and he would never had been able to perform under the agreement. *Id.* at 336–38, 508 A.2d 985.

In the case *sub judice*, the circuit court was "not shocked by the terms and provisions of either the October 18, 2005, or the February 8, 2008, contracts." The court found that Husband had bargained to "preserve his capital, to preserve his pension funds, his bank accounts." The court also found that Husband had bargained for the right to control the "stream of payments" with the alimony provision. Unlike in *Williams*, Husband did not give up all that he had or assume all the marital obligations and he negotiated certain terms, including a downgrade of his payment obligation, should his income decrease and a limitation on the time the payments were non-deductible. The circuit court was not clearly erroneous.

Husband claims that he was disadvantaged in negotiating because Wife knew about all his assets, but he did not know about hers rendering the agreement unfair. We find Husband's argument unpersuasive. Husband and Wife purchased the Oak Knoll property subject to a joint mortgage and, in applying for the mortgage, the parties completed financial information for the lender putting Husband on notice of Wife's assets and liabilities. Husband also testified on cross-examination that he and Wife had "general discussion" and conversations about their respective retirement assets, with Wife commenting on how her employment in the private sector had not allowed her to accumulate a pension the way Husband had

in the federal government. Husband also admitted that in July of 2005, he co-signed with Wife so she could take a loan against her retirement account.

The testimony demonstrates that Husband and Wife established and used joint accounts for their finances. Husband testified that Wife was the primary bill payer and that he was not privy to Wife's expenses, spending habits, or credit cards. However, his previous testimony that she paid bills out of the joint account contradicts his assertion of having no knowledge. Even a modicum of investigation would have alerted Husband to what Wife was paying out of the joint account. Similarly, Husband testified that he was unaware of how much Wife was withholding from her taxes, but then testified that he set the amount of his withholding and Wife provided him with copies of the joint tax returns she prepared, beginning in 2003, where the withholding was combined. We are confident that Husband was capable of subtracting the amount of his withholding, which he would have known from his W–2 statements each year, from the combined amount on the tax returns.

The separation agreements also contain the following provision, initialed by Husband:

## FINANCIAL DISCLOSURE

By execution of this Agreement, each party warrants and represents to the other party that he or she has fully disclosed their financial status, including their assets and liabilities of all types and agree that the terms of this Agreement are fair, just, equitable after consideration of the financial status of the parties.

We cannot say that the trial court erred in finding that Husband was aware of the parties' respective financial situations.

■■■■ Husband argues that the circuit court should have reviewed the terms of the separation agreements in the context of what Wife might have been awarded had the property and alimony issues gone to trial. This is not the proper standard for determining unconscionability, which is determined at the time a contract is formed. *See Cannon v.*

*Cannon,* 156 Md.App. 387, 404–05, 846 A.2d 1127 (2004). "[T]he fairness of an agreement is to be determined as of the time it was made, not on the basis of conditions occurring subsequently. Courts are not possessed of unbridled discretion to undo that which the parties fairly and voluntarily assumed, even if the agreement might be deemed imprudent." *Martin v. Farber,* 68 Md.App. 137, 144, 510 A.2d 608 (1986) (citation omitted) (reversing the trial court's finding that an antenuptial agreement was unconscionable because of resulting circumstances upon the wife's death). While, as Husband argues extensively, Maryland disfavors awards of permanent alimony, it does favor parties settling their disputes without the use of the courts, and presumes the validity of settlement agreements. *See* Md.Code (1984, 2006 Repl.Vol.), Family Law Article § 8–101.[10]

The circuit court was not required to engage in a lengthy analysis of the agreements compared to what "might" happen in a divorce proceeding. The circuit court acknowledged that Wife would not likely be awarded alimony in the amount provided for in the agreement but stated that Husband "bargained for these very terms." Contrary to Husband's assertions, we find that the record contains evidence regarding both parties' assets, as well as Husband's knowledge of those assets and, therefore, conclude that the circuit court considered this evidence in its determination of unconscionability. For the reasons discussed above, the circuit court's conclusion was not clearly erroneous.

### B. Confidential Relationship

As stated in *Blum, supra,* the next step after determining that the terms of the agreement are fair, is to consider

---

10. **§ 8–101. Deeds, agreements, and settlements valid.**

(a) *Deed or agreement.*—A husband and wife may make a valid and enforceable deed or agreement that relates to alimony, support, property rights, or personal rights.

(b) *Settlement.*—A husband and wife may make a valid and enforceable settlement of alimony, support, property rights, or personal rights.

the existence of a confidential relationship. The existence of an attorney-client relationship creates a confidential relationship as a matter of law. *Latty v. St. Joseph's Soc'y of the Sacred Heart*, 198 Md.App. 254, 266, 17 A.3d 155 (2011); *see Upman v. Clarke*, 359 Md. 32, 42, 753 A.2d 4 (2000); *Sanders v. Sanders*, 261 Md. 268, 276, 274 A.2d 383 (1971). Therefore, we must determine if the circuit court correctly determined that no attorney-client relationship existed between Husband and Gu.

Husband asks us to differentiate between "first-level" and "second-level" facts found by the circuit court and to afford no deference to the court's findings regarding the existence of an attorney-client relationship between Husband and Gu. In support of this argument, Husband cites to *In re Danielle B.*, 78 Md.App. 41, 60, 552 A.2d 570 (1989) (citation omitted), where this Court stated: "While the master's findings as to first-level facts—those which answer the What?, Where?[,] and How? questions—are to be given great deference, conclusory or dispositional second-level facts, those which are indistinguishable from the recommendation are the province of the juvenile court judge" and to *Levitt v. Levitt*, 79 Md.App. 394, 556 A.2d 1162 (1989) (remanding for the appointment of a Best Interest Attorney for the minor child). Husband's reliance on these cases is misplaced.

*In re Danielle B.* dealt with a Child in Need of Assistance petition where the Master made findings that the children's testimony was not credible, and upon the filing of exceptions, the juvenile court failed to evaluate the facts in any way and denied the children's request for a de novo hearing. This Court held that the juvenile court erred in affirming the Master without conducting a "complete, in depth, investigation and review[.]" *In re Danielle B.*, 78 Md.App. at 62, 552 A.2d 570. Likewise, *Levitt* dealt with a change of custody following a separation agreement where this Court explained that deference differed because "the Master is a ministerial and not a judicial officer[.]" 79 Md.App. at 399, 556 A.2d 1162 (citation omitted).

We need not engage in an analysis of what constitutes "first-level" versus "second-level" factual findings by the circuit court. As Wife correctly points out, we examine the circuit court's findings for clear error, regardless of their level. As discussed above, we need not consider Husband's supplementary evidence in order to conclude that the circuit court erred in finding that no attorney-client relationship existed between Husband and Gu regarding the immigration matters. In explaining this conclusion, a brief overview of the immigration process is warranted.

A citizen who wants an immediate relative, such as a spouse, to immigrate to the United States and achieve LPR status must file a petition on behalf of that relative. United States Code, Title 8, § 1154, entitled "Procedure for granting immigrant status" provides in pertinent part:

(a) Petitioning procedure.

(1)(A)(i) Except as provided in clause (viii), any citizen of the United States claiming that an alien is entitled to classification by reason of a relationship described in paragraph (1), (3), or (4) of section 203(a) [8 USCS § 1153(a) ] or to an immediate relative status under section 201(b)(2)(A)(i) [8 USCS § 1151(b)(2)(A)(i) ] may file a petition with the Attorney General for such classification.

Numerous documents are required as part of the petition, including a Petition for Alien Relative (I–130) and evidence of the petitioner's citizenship. 8 C.F.R. 204.1. To prove that the immigrant relative will be not become a public charge,[11] the petitioning relative must submit an Affidavit of Support with documentation demonstrating the ability to provide the necessary support. United States Code, Title 8, § 1183a, entitled "Requirements for sponsor's affidavit of support" states in part:

---

11. "[T]he immigration agency has defined a 'public charge' as an individual who is 'primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense.' " 5–63 *Immigration Law and Procedure* § 63.05.

f) Sponsor defined.

(1) In general. For purposes of this section the term "sponsor" in relation to a sponsored alien means an individual who executes an affidavit of support with respect to the sponsored alien and who—

(A) is a citizen or national of the United States or an alien who is lawfully admitted to the United States for permanent residence;

(B) is at least 18 years of age;

(C) is domiciled in any of the several States of the United States, the District of Columbia, or any territory or possession of the United States;

(D) is petitioning for the admission of the alien under section 204 [8 USCS § 1154]; and

(E) demonstrates (as provided in paragraph (6)) the means to maintain an annual income equal to at least 125 percent of the Federal poverty line.

\* \* \*

(6) Demonstration of means to maintain income.

(A) In general.

(i) Method of demonstration. For purposes of this section, a demonstration of the means to maintain income shall include provision of a certified copy of the individual's Federal income tax return for the individual's 3 most recent taxable years and a written statement, executed under oath or as permitted under penalty of perjury under section 1746 of title 28, United States Code, that the copies are certified copies of such returns.

(ii) Flexibility. For purposes of this section, aliens may demonstrate the means to maintain income through demonstration of significant assets of the sponsored alien or of the sponsor, if such assets are available for the support of the sponsored alien.

(iii) Percent of poverty. For purposes of this section, a reference to an annual income equal to at least a particular percentage of the Federal poverty line means an annual

income equal to at least such percentage of the Federal poverty line for a family unit of a size equal to the number of members of the sponsor's household (including family and non-family dependents) plus the total number of other dependents and aliens sponsored by that sponsor.

(B) Limitation. The Secretary of State, or the Attorney General in the case of adjustment of status, may provide that the demonstration under subparagraph (A) applies only to the most recent taxable year.

The Court of Appeals has stated that "what constitutes an attorney-client relationship is a rather elusive concept." *Atty. Griev. Comm'n v. Brooke,* 374 Md. 155, 172–73, 821 A.2d 414 (2003) (citations omitted). Contrary to Husband's assertion that the Court of Appeals "declared" that the three-part test referenced in *Brooke* is the standard for determining the existence of an attorney-client relationship, the Court actually adopted the test set forth in the Restatement (Third) of the Law Governing Lawyers § 14 (2000).[12] In *Atty Griev. Comm'n v. Siskind,* 401 Md. 41, 72, 930 A.2d 328 (2007) (quoting *Brooke,* 374 Md. at 174, 821 A.2d 414), the Court stated:

An attorney-client relationship is formed when: (1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and ... (b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services[.]

---

**12.** In *Brooke,* the Court actually stated:

Many courts have adopted the following standard to assess whether the relationship has been established: An attorney-client relationship is said to have been created when (1) a person seeks advice or assistance from an attorney; (2) the advice or assistance sought pertains to matters within the attorney's professional competence; and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance.

374 Md. at 174. The Court then discussed the test found in the Restatement.

*See also Atty. Griev. Comm'n v. Kreamer,* 404 Md. 282, 318, 946 A.2d 500 (2008) (finding an attorney-client relationship existed when client turned over documentation necessary for the representation and paid a retainer fee).

■■■ The testimony established that Gu prepared the petitions for the benefit of Wife, using documentation supplied by Husband. Husband was required to be the petitioner, thus making any services provided by Gu in furtherance of the immigration petition for his benefit as well as Wife's. Husband's furnishing of the necessary documentation to enable Gu to prepare the petition was a manifestation of his intent that she provide legal services to him.[13] The Affidavit of Support affirmed by Husband also created legal obligations for Husband. Gu, as an experienced immigration lawyer, manifested her consent to provide legal services for Husband by preparing forms obligating him to support Wife and using documentation supplied by him. The circuit court erred when it concluded that no attorney-client relationship existed between Husband and Gu in the immigration matters.

---

**13.** The definition of "legal services" in the immigration context can be found in the Maryland Immigration Consultant Act ("MICA"), which is codified in Md.Code (1975, 205 Repl.Vol.), Commercial Law Article §§ 14–3301 to –3306. MICA § 14–3301, entitled "Definitions" states in pertinent part:

(d) Immigration matter.—"Immigration matter" means any legal proceeding, filing, or action that: (1) Affects the immigration status of a noncitizen; and

(2) Arises under: (i) Any immigration and naturalization law, executive order, or presidential proclamation of the United States or any foreign country; or

(ii) An action of the United States Department of Homeland Security, the United States Department of Labor, the United States Department of State, the United States Department of Justice, or the United States Department of Commerce.

(e) Legal services.—(1) "Legal services" means the legal representation of an individual.

(2) "Legal services" includes providing forms to an individual, completing forms on behalf of an individual, filing forms on behalf of an individual, advising an individual to file forms, or applying for a benefit on behalf of an individual.

*Atty. Griev. Comm'n v. Brisbon,* 422 Md. 625, 642–44, 31 A.3d 110 (2011).

Husband argues that because of the attorney-client relationship existing in the immigration matters, Gu was required, pursuant to Rule 1.9(a) of the Maryland Rules of Professional Conduct ("MRPC"), to obtain informed consent from Husband before representing Wife in preparation of the separation agreements. MRPC 1.9 states in pertinent part:

Rule 1.9. Duties to Former Clients.

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client:

(1) whose interests are materially adverse to that person; and

(2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client gives informed consent, confirmed in writing.

Husband argues that the matters are "substantially related" because Gu "received private, confidential information from him" during the course of her representation of the parties in the immigration matter. Husband further contends that because Gu never disclosed "material risks" of her representation of Wife, he was unable to give "informed consent," and he was not informed that the dual representations had ceased. Husband avers that the consequences of Gu's failure to seek informed consent from him resulted in a confidential relationship between himself and Gu, where he reasonably believed Gu was acting for both himself and Wife in preparing the Agreements. We disagree.

In *Buckley v. Airshield Corp.,* the District Court for the District of Maryland stated:

In order to show a substantial relationship, it is not necessary that two lawsuits involve the same operative facts, so long as there is a sufficient similarity of issue. The Court must, therefore, examine the nature and scope of the prior and present representation and determine whether confidences might have been disclosed in the course of the prior representation which could be relevant to the present action.

908 F.Supp. 299, 304–05 (D.Md.1995) (footnote, citations and internal quotations omitted). In *Buckley*, the court found a substantial relationship because "[a]t the core of each action is the challenge to the validity of [plaintiff's] patent" and because the defendant was challenging the validity of the patent "using the very information it received from parties it once sued to protect [plaintiff's] patent[.]" *Id.* at 305. The Court of Appeals has held that confidential information is, as a matter of law, shared in the course of a prior attorney-client relationship. *See Siskind*, 401 Md. at 59, 930 A.2d 328; *but see Balt. Cnty. v. Barnhart*, 201 Md.App. 682, 709 n. 20, 30 A.3d 291 (2011) (burden of proof with appellant to show that appellee received confidential information that could be used against appellant). "The relevant question, therefore, is whether the confidential information which is assumed to have been shared in the previous representation could be used to the detriment of the former client in the current proceeding." *Nichols Agency, Inc. v. Enchanted Child Care, Inc.*, 537 F.Supp.2d 774, 780 (D.Md.2008).

The immigration petitions and the separation agreements involve wholly different practical areas of law and issues and, therefore, are not substantially related. The information provided to Gu in connection with the 2003 immigration petition consisted of tax returns from 2000 to 2002 and pay stubs from 2002 for Husband for employment that was different from that which he held in 2005 and 2008. Any confidential information provided to Gu in 2003 was irrelevant to the drafting of the First Agreement, for which Wife provided new documentation obtained from joint tax returns and joint accounts. Therefore,

Gu was not required to obtain informed consent from Husband before drafting the separation agreements as Wife's attorney.

Husband cites *Blum*, 59 Md.App. 584, 477 A.2d 289, in support of his contention that Gu was required to disclose "the pitfalls and dangers to Husband" and, therefore, "led Husband to believe that Attorney Gu was acting for Husband *and* Wife." (Emphasis in original). The facts in *Blum* are not analogous to this case. In *Blum*, the husband dominated the wife, the parties went to the attorney's office together, the husband dictated the terms to the attorney, the attorney never advised the parties of their respective rights, and the attorney was found to be engaging in dual representation.

In the instant case, Husband had no contact with Gu, Wife told Husband that she would ask Gu to prepare the separation agreements for her, Husband acknowledged, both in e-mail to Wife and in his Motion to Set Aside, that Gu did not represent Husband in preparation of the agreements, and the agreements specifically advised Husband to seek independent counsel. Therefore, unlike in *Blum*, Gu was not representing both Husband and Wife when she prepared the separation agreements.

 Absent the presumption of a confidential relationship, Husband bears the burden of establishing that a confidential relationship existed by clear and convincing evidence. *See Lasater v. Guttmann*, 194 Md.App. 431, 458, 5 A.3d 79 (2010); *Bell v. Bell*, 38 Md.App. 10, 14, 379 A.2d 419 (1977) ("When the presumption is disregarded the question of whether a confidential relationship exists ... becomes a question of fact."). Husband failed to do so. The record contains no evidence that Husband reasonably relied on any statement of Gu's in executing the agreements to his detriment, and Gu did not dominate Husband in his negotiations in any way. The record shows that Gu incorporated changes made by Husband and forwarded to her by Wife. Husband alleged no infirmity or other incompetence and the circuit court found him to be highly intelligent, educated, articulate, and with business savvy. *See Bell*, 38 Md.App. at 14, 379 A.2d 419 ("various factors to be

considered in determining whether a confidential relationship exists are the age, mental condition, education, business experience, state of health, and degree of dependence of the [party] in question") (citations omitted). Husband was not dominated by Wife or impaired from advanced age. The circuit court's finding that no confidential relationship existed between Husband and Gu is supported by the evidence.

Additionally, Husband was a well-educated professional with many years of experience managing and negotiating government projects, and he had already experienced a prior divorce with a settlement agreement. *See, e.g., Herget v. Herget,* 77 Md.App. 268, 550 A.2d 382 (1988), *rev'd on other grounds,* 319 Md. 466, 573 A.2d 798 (1990) (explaining that Wife understood the full meaning and effect of a waiver of alimony in antenuptial agreement because she had executed, and abided by, a similar waiver in a separation agreement from her first husband). Husband could not have reasonably relied on a person with whom he had no contact, to act for his benefit or to reasonably believe that Wife would act for his benefit. Unlike in *Hale,* the parties were no longer cohabitating and both intended to divorce.

Moreover, once Husband received the draft First agreement, he was on notice that Gu and Wife were working to benefit Wife. Wife's testimony that she told Husband to seek his own counsel, notwithstanding, the First Agreement itself advised Husband to seek independent counsel. Both agreements contained the following provision:

### INDEPENDENT COUNSEL

Wife hereby acknowledges that Yu Gu, Esquire has represented her in drafting and execution of this Agreement. Husband acknowledges that he has been advised and afforded the opportunity to obtain independent counsel of his own selection in connection with this Agreement, so that he may have his own attorney answer any questions, which he may have. Husband further acknowledges that Wife's attorney has neither represented Husband nor provided him with

any legal advice in connection with the terms or operating effect of this Agreement. Finally, Husband acknowledges that his decision to execute this Agreement without his own attorney is made freely and voluntarily.

Husband initialed the page containing the independent counsel provision. Husband did not seek counsel in 2005 or during the preparation of the Second Agreement, despite the fact that the circumstances surrounding the drafting of that agreement were substantially similar. It was not reasonable for Husband to believe that Gu would act in his benefit when drafting the Second Agreement. *See, e.g., Desser v. Woods,* 266 Md. 696, 709, 296 A.2d 586 (1972) (to enforce its rights, a confiding party must act once it "has actual knowledge during the existence of the confidential relationship that the confidential relationship has been abused"); *O'Hara v. Kovens,* 60 Md.App. 619, 632–33, 484 A.2d 275 (1984).

### *C. Procedural Unconscionability*

"As with other contracts, a separation agreement is voidable, and subject to recision, if it can be shown that it was unconscionable or procured through fraud, duress, or undue influence." *Young,* 146 Md.App. at 595, 807 A.2d 651 (citations omitted). Husband correctly states an unconscionable contract has been "defined as one characterized by 'extreme unfairness,' which is made evident by '(1) one party's lack of meaningful choice, and (2) contractual terms that unreasonably favor the other party.'" *Walther,* 386 Md. at 426, 872 A.2d 735 (quoting BLACK'S LAW DICTIONARY 1560 (8th ed.2004)). Thus, unconscionability can be classified as "procedural" when there is a lack of meaningful choice in the formation of the contract, or "substantive" when the terms are so one-sided as to "shock the conscience" of the court. *Id.; Blum,* 59 Md.App. at 591, 477 A.2d 289.

Husband argues, essentially, that procedural unconscionability is present because Gu and Husband enjoyed a confidential relationship at the time the agreements were

formed and Gu had an undisclosed conflict of interest. This Court

> has repeatedly held that ordinarily a transaction will be set aside if it is shown that a party to the transaction was represented by an attorney who simultaneously represented adverse interests, whether the adverse interests were those of the attorney or of other clients, *and* that the attorney exercised undue influence or perpetrated a fraud, or that the transaction was otherwise unfair.

*Walton v. Davy,* 86 Md.App. 275, 287, 586 A.2d 760 (1991) (finding no conflict of interest where attorney had previously represented one party in real estate and divorce matters several years before representing an adverse party in an estate matter) (citations omitted). The *Williams* Court explained unconscionability, quoting *Straus v. Madden,* 219 Md. 535, 543–44, 150 A.2d 230 (1959), in part:

> The fact that a conveyance or other transaction was made without professional advice or consultation with friends, and was improvident, even coupled with an inadequacy of price, is not of itself a sufficient ground for relief, provided the parties were both able to judge and act independently, and did act upon equal terms, and fully understood the nature of the transaction, and there was no undue influence or circumstance of oppression. When the accompanying incidents are inequitable and show bad faith, such as concealments, misrepresentations, undue advantage, oppression on the part of the one who obtains the benefit, or ignorance, weakness of mind, sickness, old age, incapacity, pecuniary necessities, and the like, on the part of the other, these circumstances, combined with inadequacy of price, may easily induce a court to grant relief, defensive or affirmative.

306 Md. at 340–41, 508 A.2d 985. As discussed, none of the factors described above are present here. Also, Gu and Husband had no attorney-client relationship in regard to the separation agreement matters and Gu, having no contact whatsoever with Husband, exercised no undue influence over him.

### D. Harmless Error

▮▮▮▮ Assuming, without deciding, that the First Agreement was invalid on the grounds that it was unconscionable because Husband believed Gu was still his attorney, and he had no information regarding Wife's finances, any error committed by the circuit court by incorporating it into the Judgment for Absolute Divorce is harmless. Explaining harmless error, the Court of Appeals has stated: "It is the policy of this Court not to reverse for harmless error and the burden is on the appellant in all cases to show prejudice as well as error. Prejudice will be found if a showing is made that the error was likely to have affected the verdict below." *Crane v. Dunn,* 382 Md. 83, 91, 854 A.2d 1180 (2004) (citations omitted).

In the instant case, any error did not affect the circuit court's decision. The Second Agreement superseded the First Agreement and Wife only requested that the Second Agreement be validated and enforced. As discussed, Husband was aware, after receiving the First Agreement, that Gu was acting only as Wife's attorney and he was advised to seek independent counsel. Husband had numerous opportunities over the next several years to investigate Wife's spending and financial situation. Husband's notice and failure to perform any due diligence, while simultaneously engaging in the same type of extramarital behavior that led to discussions of separation in 2005, obviates any unconscionability that may have previously existed by the time the Second Agreement was executed.

### III. Circuit Court's Denial of Husband's October 14, 2011 Motion to Revise

Husband argues that the circuit court abused its discretion because it denied his motion without addressing his request for a hearing, Wife's response in opposition, or his reply with exhibits to Wife's response. Husband's exhibits included information gleaned through his FOIA request to USCIS regarding Gu's submissions in the immigration matters and he

reposits the arguments made regarding the circuit court's denial of his Motion to Set Aside.

Wife counters that the circuit court did not abuse its discretion, because it was not required to hold a hearing or consider either Wife's response or Husband's reply to Wife's response, when denying a motion filed pursuant to Maryland Rule 2–535(b). Wife argues that the denial was proper because Husband failed to prove extrinsic fraud, a necessary finding for the court to reopen the judgment. Wife asserts that any untruthfulness or misunderstanding by Gu, regarding the existence of an attorney-client relationship between herself and Husband, does not constitute extrinsic fraud; neither does Gu's failure to provide accurate copies of the original immigration submissions. Wife further contends that Husband did not act with due diligence or good faith because he waited nearly a full year to file his FOIA request after he had received Gu's case files.

Maryland Rule 2–535(b) states: "On motion of any party filed at any time, the court may exercise revisory power and control over the judgment in case of fraud, mistake, or irregularity." This Court stated in *Das,* 133 Md.App. at 17, 754 A.2d 441, that for a 2–535(b) motion to have merit, a party must prove extrinsic fraud by clear and convincing evidence. The Court of Appeals recently stated in reviewing a motion to vacate a judgment that "[u]nder Md. Rule 2–535(b), fraud is defined as an event that is 'collateral to the issues tried in the case where the judgment is rendered[,]' such as 'whether the fraud prevented the actual dispute from being submitted to the fact finder at all.'" *Powell v. Breslin,* 430 Md. 52, 71, 59 A.3d 531 (2013) (quoting *Hresko v. Hresko,* 83 Md.App. 228, 232, 574 A.2d 24 (1990)).

Wife cites to *Das,* where this Court explained that "[i]ntrinsic fraud occurs within the case itself when, for example, a witness perjures himself or a party offers a forged instrument into evidence." 133 Md.App. at 18, 754 A.2d 441. Husband argues that Gu engaged in both such actions—lying under oath about the scope of her representation and providing

immigration documentation that was false. Husband contends that an adversarial trial could not be had because Gu "attempted to conceal any and all evidence of the attorney-client relationship, including the existence of a conflict. . . ." However, the record demonstrates that Gu was extensively cross-examined regarding her representation and the circuit court did not err in finding that no attorney-client relationship existed between Husband and Gu as to the drafting of the First and Second Agreements.

■■■■ Husband's argument that the circuit court erred by not making factual findings before denying his Motion to Revise is meritless. The case cited by Husband, *Blitz v. Beth Isaac Adas Israel Congregation*, 115 Md.App. 460, 694 A.2d 107 (1997), addresses Md. Rule 1–341, not Md. Rule 2–535, and is inapplicable. Maryland Rule 2–535(a) states: "On motion of any party filed within 30 days after entry of judgment, the court may exercise revisory power and control over the judgment and, if the action was tried before the court, may take any action that it could have taken under [R]ule 2–534." Maryland Rule 2–311(e), governing "Motions" states: "When a motion is filed pursuant to [R]ule 2–532, 2–533, or 2–534, the court shall determine in each case whether a hearing will be held, but it may not grant the motion without a hearing." Nothing in the Maryland Rules requires a hearing when a motion to revise a judgment based on "fraud, mistake, or irregularity" is denied.

Moreover, the Court of Appeals recently clarified what procedure is required in granting a Md. Rule 2–535 motion:

> Unlike Rule 2–534, Rule 2–535 is not specifically referenced in Rule 2–311 and, thus, even though it too addresses the court's revisory power, permitting the court to "take any action that it could have taken under Rule 2–534," a motion pursuant to it does not require a hearing to be granted. Nor are motions filed pursuant to Rule 2–535 limited to actions decided by the court and filed within ten days after entry of judgment.

*Miller v. Mathias,* 428 Md. 419, 441, 52 A.3d 53 (2012). Accordingly, the circuit court did not err or abuse its discretion in denying Husband's Motion to Revise without a hearing or addressing Wife's response and Husband's reply.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**